RICKY SMITH PONTIAC, INC. *vs.* SUBARU OF NEW ENGLAND, INC., & others.[1]

Norfolk. May 14, 1982. — September 14, 1982.

Present: ARMSTRONG, ROSE, & GREANEY, JJ.

*Motor Vehicle,* Dealer, Franchise. *Practice, Civil,* Requests for findings and rulings. *Statute,* Construction, Retroactivity. *Damages,* Loss of prospective profits, Wrongful grant of franchise.

Where a judge's memorandum of decision, prepared at the conclusion of the trial of a civil action without jury, fully articulated his thought processes and implicitly addressed all of the defendants' requests for findings of fact and rulings of law, the judge's failure to act specifically on each such request was not a ground for reversal on appeal. [404-405]

In an action by an automobile dealer against an automobile franchisor challenging the grant of a competing dealer franchise as an unfair and deceptive practice prohibited by G. L. c. 93B, §§ 3 & 4, the judge's analysis established that he had correctly sought to determine the plaintiff's "relevant market area" by equitable principles pursuant to G. L. c. 93B, § 4 (3) (*l*), as in effect prior to its amendment by St. 1977, c. 717, § 3, and not, as the defendants contended, by a simplistic tally of automobile sales. [406-409]

In determining an automobile dealer's "relevant market area" in accordance with equitable principles in an action governed by G. L. c. 93B, § 4 (3) (*l*), prior to its amendment by St. 1977, c. 717, § 3, the judge was not required to base his conclusion chiefly on principles of Federal antitrust law [409-410], and appropriately took guidance from the definition of the term "relevant market area" as appearing in the 1977 amendment [410-411].

Although the amendments to G. L. c. 93B, § 4 (3) (*l*), contained in St. 1977, c. 717, § 3, respecting the determination of an automobile dealer's "relevant market area," were neither retroactive in effect nor intended by the Legislature to clarify the "equitable principles" standard provided by the statute prior to its amendment, nevertheless, where a judge, in an action governed by the statute as in effect prior to the 1977 amendment had looked to the 1977 language for guidance but had concurred in both counsels' incorrect interpretation of the amendment,

---

[1] Nick Masabny and South Shore Subaru, Inc.

the judge was directed to apply the correct test on remand before exercising anew his independent judgment on equitable principles in accordance with the earlier statute governing the action. [411-415]

At the trial of an action by an automobile dealer against an automobile franchisor, challenging the grant of a competing dealer franchise, the judge, in making his determination that the grant of the competing franchise was arbitrary, did not err by requiring the franchisor to justify its grant of the competing franchise and by considering the franchisor's failure to assemble relevant data at the time the grant was made as evidence of arbitrariness, despite the franchisor's assembly, after the fact, of information tending to support its actions. [415-416]

Where an automobile dealer's franchise agreement did not define the terms "market area" and "normal area of operations," the agreement's reference to "applicable law" made G. L. c. 93B controlling of the parties' rights under the agreement. [416-417]

On a counterclaim by an automobile franchisor against a dealer, the evidence warranted the judge's conclusion that the dealer had not breached its obligation under the franchise agreement to promote the sale of the franchisor's product throughout the dealer's market area. [417-418]

At the trial of an action by an automobile dealer alleging that an automobile franchisor had committed unfair and deceptive practices prohibited by G. L. c. 93B, the judge was warranted in concluding that an association of dealers handling the same make of automobiles, formed for the purpose of processing mutual grievances against their franchisor and safeguarding their market areas, had not violated Federal antitrust laws. [418-420]

A judge had the power to declare void an automobile dealership agreement which he found to be violative of G. L. c. 93B. [422]

At the trial of an action by an automobile dealer against an automobile franchisor, in which the judge found that the franchisor's grant of a competing franchise had violated G. L. c. 93B, his further finding that the plaintiff had been damaged through loss of automobile sales to the competing dealership was not clearly erroneous, and his resolution of conflicting testimony respecting the amount of damages was proper [422-424]; however, on remand the plaintiff was to substantiate its claim that the damages should not be offset by increases in certain costs which would have occurred if the lost automobile sales had actually been made [424-429].

In an action by an automobile dealer against an automobile franchisor seeking damages under G. L. c. 93B for the improper granting of a franchise to a competing dealer, damages for profits lost as a result of the competing dealer's sales should be measured by all such sales occurring in the plaintiff's relevant market area and not merely by sales occurring in the overlapping part of the two dealers' respective relevant market areas. [430-431]

CIVIL ACTION commenced in the Superior Court on June 12, 1978.

The case was heard by *Donahue, J.,* and was reported by him.

*Robert W. Mahoney (William K. Dodds* with him) for the defendants.

*Allan R. Rosenberg (Alexander Whiteside* with him) for the plaintiff.

GREANEY, J.   Named for a constellation,[2] the Subaru is a Japanese manufactured automobile which arrived on the American scene in the early 1970's.  This case arises out of a dispute between members of Subaru's New England distribution chain which was precipitated by Subaru of New England's (SNE) grant, on February 1, 1978, of a motor vehicle franchise to the defendant Masabny.  The plaintiff (Ricky Smith) challenged the grant as an impermissible intrusion on its "relevant market area," alleging that SNE had violated the plaintiff's franchise agreement and had committed unfair and deceptive practices in violation of G. L. c. 93B, §§ 3 and 4.  SNE counterclaimed, alleging (1) that Ricky Smith had violated the franchise agreement by failing to promote Subaru's products aggressively in its immediate geographic area; and (2) that Ricky Smith had illegally conspired with other dealers in restraint of trade to prevent SNE from making new dealer appointments.  After a lengthy trial without jury, a judge of the Superior Court made findings of fact and rulings of law which were, on the whole, favorable to Ricky Smith's position on the issues.  The trial judge then reported the propriety of his decision on the lia-

---

[2] In the Japanese language "Subaru" is the term for "Pleiades," in turn the designation of a cluster in the constellation Taurus.  The astronomical use of the term derives from Greek mythology in which the daughters of Atlas were collectively called Pleiades.  The star grouping was chosen by Fuji Heavy Industries, Ltd., Subaru's manufacturer, to symbolize the simultaneous unity and individuality of the six original companies which were merged, shortly after World War II, to form the Fuji conglomerate. All Subaru automobiles have the star cluster on their grilles.  See Automotive Iconography, Auto Week, July 26, 1982, at 21.

bility questions to this court.[3] See G. L. c. 231, § 111, as appearing in St. 1973, c. 1114, § 199; Mass.R.Civ.P. 64, 365 Mass. 831 (1974); *McStowe* v. *Bornstein,* 377 Mass. 804, 805 n.2 (1979).

1. *Background facts found by the trial judge.* SNE, a Massachusetts corporation, is the sole distributor of Subaru automobiles for the six New England States, having been appointed by Subaru's exclusive importer to the United States, Subaru of America, Inc.[4] Ricky Smith, one of nearly eighty Subaru retail dealers in New England, was granted a franchise by SNE in 1970. The agreement between Ricky Smith and SNE was renewed periodically, and had been most recently extended through October of 1979.[5] Ricky Smith's total investment in expanding and improving its facility for Subaru sales and service has exceeded $500,000. Prior to 1975, Midway Auto Sales, Inc. (Midway), located in Abington, Massachusetts, some 7.4 miles south of Ricky Smith, was granted a Subaru franchise by SNE. Approximately ten other Subaru franchises, awarded in the area within fifteen miles of Ricky Smith's dealership, went out of business between 1970 and 1977. By 1978, Midway was Ricky Smith's only competing Subaru dealer in the geographic area known as the "South Shore."

In 1976, Masabny wrote to SNE expressing interest in obtaining a Subaru franchise in the area of the towns of Hanover, Marshfield, or Pembroke (all located in Plymouth County). Masabny made formal application for a franchise

---

[3] In addition to documents ordinarily found in an appendix, we have before us 129 documentary exhibits and a considerable portion of the oral testimony which has been designated by the parties from the twenty-two volumes of testimony given at the trial.

[4] Background on Subaru's importing and regional distribution process is contained in *Grappone, Inc.* v. *Subaru of New England, Inc.,* 534 F. Supp. 1282, 1284 (D.N.H. 1982).

[5] Ricky Smith operates a dual dealership of Subaru and Pontiac automobiles from its location in the town of Weymouth. It was granted its Pontiac franchise from General Motors in 1959. The trial judge found that to combine a foreign with an American line make in one dealership is a common practice in eastern Massachusetts.

on July 6, 1977. SNE, which was considering establishing a dealership in the Plymouth county area, informed Masabny that such a dealership would have to be located on Route 53 and would have to be a separate, not a dual dealership, facility. By December of 1977, SNE and Masabny had agreed on a site on Route 53 in Hanover, close to several small shopping centers and other automobile dealerships. Masabny in turn had satisfied SNE that he possessed or had access to sufficient capital and financing. A franchise agreement was executed on February 1, 1978,[6] and was amended on April 10, 1978, to relocate the dealership on Route 53 about one-quarter mile away in the town of Pembroke.[7] The Pembroke site, from which Masabny began conducting business on November 14, 1978, as South Shore Subaru, Inc. (South Shore), was situated approximately 10.5 miles southeast of Ricky Smith's and 7.8 miles east of Midway's dealerships.[8]

Neither Ricky Smith nor Midway was notified, when Masabny's July 6, 1977, application was accepted, that SNE considered the Hanover-Pembroke area an "open point," i.e., an area deemed to have sufficient present potential for an additional or new dealership. In late December, 1977, however, before their agreement was reduced to writing,

[6] Also executed on the same date was an addendum to the agreement which provided that SNE would assume Masabny's legal defense against any claim that Masabny was located in the relevant market area of another Subaru franchisee. The agreement further provided for SNE's repurchase of automobiles and acquisition of Masabny's land and buildings in the event of a final judgment against him. On the same date Masabny gave SNE a check for approximately $21,000 and signed a purchase order for a standard new dealer's package of parts, accessories, and supplies.

[7] Masabny had applied to the town of Hanover for the necessary permits and licenses. Because of a town moratorium on building in the area encompassing the dealership site, SNE and Masabny executed an amendment under which the site would be moved to the town of Pembroke. Additionally, Masabny would be permitted to assign his dealership, while retaining executive and voting control, to South Shore Subaru, Inc., a Massachusetts corporation.

[8] Midway brought a related action against SNE which was settled before Ricky Smith's action came to trial.

SNE informed Masabny that both Ricky Smith and Midway would have to be given a chance to say "no" to opening in the Hanover-Pembroke area. On January 26, 1978, at a meeting between Ricky Smith's president (Ricky Smith, Sr.) and SNE's chief executive officer (Ernest Boch), Smith was informed that SNE had decided that a new dealer was needed on Route 53 in the Hanover area. Smith was told that he could have the Route 53 dealership if he would move his Subaru franchise there and build a new and separate facility. If Smith agreed, his allocation, or "travel rate," would be fifty Subarus per month. In context, this meant an initial monthly allocation of fifty new automobiles.[9] If Smith refused to move, Boch intended to put a new franchise in the area of Quincy, a large community immediately northwest of Weymouth. Moreover, absent a move, Smith's dealership would not be upgraded to the fifty automobiles per month allocation unless it built an entirely new and separate Subaru facility at its current location. In the meantime, the franchise on Route 53 would be awarded to

---

[9] The term "travel rate" was also used at trial to denote a dealer's average number of sales over a three-month period. As used in this sense, the travel rate affects the monthly allocation of automobiles from the distributor to a dealer. Other factors affecting monthly allocations include the inventory and sales of all dealers in the region, the awarding of new dealerships and the upgrading of existing dealers' allocations in the region. A low initial allocation, poor sales over a three-month period, or a large inventory on the closing date of a three-month period, would tend to lower monthly allocations. It is often difficult for an established dealer to increase its allocation. Although Ricky Smith sold all the Subarus it was allocated in 1978, and was listed as ninth in sales among seventy-four Subaru dealers in New England, its monthly allocation did not meaningfully increase because other New England dealers were also selling well and competing for the automobiles available to the distributor. While the plaintiff's sales averaged fifteen per month, automobiles left in inventory averaged nineteen per month, thereby affecting its travel rate and hence its monthly allocations. From one shipment Ricky Smith was allocated only ten new cars. The offer of an initial allocation of fifty Subarus was an attractive incentive in view of the public's demand for the car and the restrictions of its supply.

someone else.[10]  Smith was given five days, until January 31, to make a decision.  Smith contacted Boch on February 16, when he was formally advised that a new dealer had been appointed for the northern Plymouth (Route 53) area. The present action followed.

2. *The statutes.*  General Laws c. 93B, inserted by St. 1970, c. 814, § 1, regulates transactions among automobile manufacturers, distributors and dealers.[11]  Like G. L. c. 93A, the consumer protection statute which preceded it by three years, c. 93B, § 3(*a*), proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices."  Unlike c. 93A, however, c. 93B, § 4, specifies with some particularity those practices that shall be "deemed" unfair or deceptive under § 3(*a*).  Among other means of enforcement, the statute affords injured dealers a private damages remedy which, prior to the statute's amendment by St. 1977, c. 717, permitted a claim of up to treble damages under the provisions of G. L. c. 93A, §§ 9 and 10.  See *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707, 708-709 (1979).  One of the acts or practices proscribed under § 4(3)(*l*), prior to its amendment and the impetus behind the present action, is the improper granting of a competitive motor vehicle franchise in "the relevant market area previously granted to another franchisee."  That statute also provided that such market area "be determined exclusively by equitable principles"; with the proviso that if a "manufacturer" wished to grant such a competitive franchise, then it must give notice to the existing dealer or dealers in the area and, unless there was agree-

---

[10] Midway was also offered and declined the Hanover area franchise, ultimately choosing instead to remain in its present location and accept an upgraded allocation of vehicles.

[11] Congress's passage of the 1956 Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-1225 (1976), did not preempt the field.  A number of States have enacted regulatory schemes designed to eliminate unfair and coercive practices by automobile manufacturers and distributors.  See generally, Annot. 7 A.L.R. 3d 1173 (1966); *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319-320 (1978); Brown & Cohen, Franchise Equities, 63 Mass. L. Rev. 109, 112 (1978).

ment, the matter should be submitted to "final and binding arbitration under the principles herein prescribed, for a determination of the relevant market area, the adequacy of the servicing of the area by the existing dealer or dealers and the propriety of granting of such additional dealership."[12] By St. 1977, c. 717, enacted on November 7, 1977, and effective ninety days thereafter, sundry provisions of G. L. c. 93B were revised. Included among the revisions were amendments to § 4(3)(*l*) which (i) made it an illegal act under § 3(*a*) for a manufacturer or distributor "arbitrarily and without notice to existing franchisees" to grant a franchise to an additional franchisee who would conduct his dealership "from a place of business situated within the relevant market area of an existing franchisee or franchisees"; (ii) substituted a formula definition of "relevant market area" for the "equitable principles" determination; (iii) required, prior to such a grant, sixty days' notice to franchisees within a twenty-mile radius of the proposed new location; (iv) eliminated arbitration in favor of Superior Court review of the question whether placement of the additional franchise is arbitrary; and (v) directed the court, in determining the issue of arbitrariness, to consider "all pertinent circumstances" which may include eight stated factors. In *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.,* 376 Mass. 313 (1978) (*Tober* decision), the

---

[12] The parties make no contention that the plaintiff was required by the 1970 version of § 4(3)(*l*) to arbitrate rather than litigate its dispute with SNE. Under the 1970 statute, arbitration was required only when the appointment was made by a "manufacturer," as defined in § 1(*b*) of c. 93B. This limitation on arbitration was apparently based on the prevailing market conditions in 1970 when the domestic automobile industry was controlled by the so called "Big Three" manufacturers, General Motors, Ford and Chrysler. See generally 1968 Senate Doc. No. 983, 21-26, 43-46; Brown, A Bill of Rights for Auto Dealers, 12 B.C. Indus. & Comm. L. Rev., 757, 760-761 (1971). Arbitration was not required under the 1970 statute when the new dealer appointment was made by a "distributor" like SNE, as that term was and still is defined in § 1(*g*) of c. 93B. We do not read the dictum in *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.,* 367 Mass. 464, 471-472 (1975), which discusses the arbitration provisions of the 1970 statute, as inconsistent with these conclusions.

Supreme Judicial Court upheld the validity of § 4(3)(*l*) in
the 1970 version of the statute against attack on several con-
stitutional grounds. However, no adjudication on the
merits of an alleged violation of § 4(3)(*l*) in either version of
the statute has yet come under appellate review.[13]

3. *The effect of the trial judge's findings.* The judge filed
a sixty-page memorandum of decision which included ex-
haustive findings of fact and rulings of law on virtually all
the governing legal questions. On several of the issues
under review, the defendants contend that the trial judge
erred by failing to adopt or deny their requests for findings
of fact and to act upon their requests for rulings of law.
Since the argument is a persistent theme on the appeal, it
would be useful to clear it up at the outset.

The requirement of findings under Mass.R.Civ.P. 52(a),
365 Mass. 816-817 (1974), "serves to (1) insure the quality of
a judge's decision making process by requiring simultaneous
articulation of the judge's underlying reasoning; (2) assure
the parties that their claims have been fully and fairly con-
sidered; and (3) inform an appellate court of the basis on
which a decision has been reached." *Cormier* v. *Carty,* 381
Mass. 234, 236 (1980). As to requests for rulings of law, "a
trial judge sitting without a jury should rule on [the] re-
quests . . . in such a manner that the requesting party can
ascertain for purposes of appeal, whether the judge applied
the correct principles of law in deciding the case." *Petition
of New Bedford Child & Family Serv. to Dispense with
Consent to Adoption,* 385 Mass. 482, 491 (1982), citing *Di-
Gesse* v. *Columbia Pontiac Co.,* 369 Mass. 99, 103-104

[13]Peripheral decisions dealing with the statute include *Hein-Werner
Corp.* v. *Jackson Indus., Inc.,* 364 Mass. 523 (1974) (defining the term
"motor vehicle" as used in G. L. c. 93B, § 1[*a*], and declining to apply the
statute to contracts antedating its enactment), *Foreign Auto Import, Inc.*
v. *Renault Northeast, Inc., supra* (dismissing appeal as interlocutory and
discussing in dictum arbitration provisions in § 4[3][*l*]), and *Reiter Olds-
mobile, Inc.* v. *General Motors Corp.,* 378 Mass. 707 (1979) (affirming
dismissal of complaint on grounds that c. 93B governs remedies for viola-
tion of the statute and that § 12 does not provide for preliminary injunc-
tive relief).

(1975). In this case, "the thought process which led to [the judge's] decision [on liability] is fully articulated," *Lynn* v. *Nashawaty*, 12 Mass. App. Ct. 310, 315 (1981), in a memorandum which complies with the stated purposes of the rule. The judge's findings of fact, wherever contrary to the defendants' evidence or requests for findings of fact, import his rejection of their position on the factual issues. Specific action by the judge on the requested findings of fact was unnecessary. The judge's findings and conclusions also implicitly addressed the requests for rulings which were material to the case. "In these circumstances responses [by the trial judge] to requests for rulings are superfluous," *Lynn* v. *Nashawaty, supra* at 315, and his failure to pass on them is not a ground for reversal.

It is apparent from the record that the judge based his decision in major part on his perception of the credibility of the witnesses together with inferences drawn from their oral testimony and from facts contained in the documentary exhibits. We think it useful to state, at the threshold of the appeal, that "it is the trial judge who, by virtue of his first-hand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence," *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977), and that we are bound by his findings of fact which are supported by the evidence, which include inferences reasonably drawn therefrom. *Lawton* v. *Dracousis, ante* 164, 169 (1982), and cases cited. With these principles in mind, we turn to the substantive questions raised by the report.

4. *The plaintiff's statutory claims.* The judge found as a fact that the contract between SNE and Masabny was executed on February 1, 1978, five days before the amendments to c. 93B contained in St. 1977, c. 717, became effective. He further found there was "no question that SNE desired that its contract with Masabny be executed before the effective date of [the 1977] amendments." On appeal, it is not disputed that the 1970 statute governs the rights of the parties. The judge concluded that SNE "knowingly and in-

tentionally violated Section 4(3)(l) by granting a competitive franchise . . . in the relevant market area of the plaintiff, without compliance with the mandatory procedures as set out in said Section 4(3)(l), both as to the 1970 statute and as to the amended statute of 1977." He defined that area as an irregularly shaped geographic enclosure which represented the nearest two-thirds of the plaintiff's Subaru sales in the three-year period between June, 1975, and May, 1978. His memorandum based this demarcation on (1) the fact that the "plaintiff's relevant market area could not be determined in 1978 by [simply] drawing a circle around its location in Weymouth [since] the Atlantic Ocean compresses its market area to the north and east, and the low-income urban areas again compress . . . [its] market potential in the north and northwest; (2) the fact that the area "actually represents the area-trend of the plaintiff's sales for a considerable time prior to the granting of the new franchise, and the plaintiff is equitably entitled to it as a market area;" and (3) guidance afforded by "the provisions of G. L. c. 93B, § 4(3)(l) (1977) defining relevant market area as the area within which the existing franchise made at least two-thirds of its sales within a three-year period, prior to the granting of the new franchise."

(a) The defendants first claim that the judge failed to determine the relevant market area "exclusively by equitable principles" as required by the 1970 statute, choosing rather to ignore their extensive evidence on this crucial issue in favor of a simplistic geographic tally of Ricky Smith's sales. The defendants urge that the eleven towns and one city surrounding the plaintiff's dealership (which they variously term the "normal area of operations," "area of immediate influence," and "normal market area"), equitably constituted the plaintiff's relevant market area, to which consumers would naturally turn to buy or service their Subaru automobiles. Additionally, the defendants contend that this "normal" area was not being adequately "penetrated," that the Subaru ran behind its import competition there while Ricky Smith "pumped in" sales from a more remote

geographic area, and that Ricky Smith would not cooperate with SNE to develop its "normal" area through adequate promotion, display and advertising of Subaru products.

The trial judge dealt fully with the defendants' evidence. He found that Subaru sales in the early 1970's had been generally low because of lack of public acceptance and mechanical and engineering problems, and that the automobile had gained popularity faster in northern than in southern New England, where its sales had run behind the Datsun and Toyota lines. Over time, Subaru business had improved for Ricky Smith, which had been ranked ninth in sales of all SNE dealerships in 1975, eighteenth in 1976, and ninth in its SNE divisional sales during 1978. In 1970, Ricky Smith had twice as many orders for new Subarus as it was able to fill. Ricky Smith had established through its Pontiac and Subaru business, "considerable good will" in the South Shore area, which included northern Plymouth County. From 1975 to 1979, Ricky Smith's geographic trend of sales was southeastward of its location; sales doubled in Plymouth County while declining in the populous area immediately north of the dealership. The judge found that the "primary reason" for this trend was the market in "bedroom towns" for a less expensive, economical second car coupled with access to public transportation in the populous area to the north. Other factors considered by the trial judge were the disparity in income between urban and suburban residents, and the increasing competition of American-made compact automobiles.

The judge, who had viewed Ricky Smith's premises, also found that the dealership displayed three Pontiac and two Subaru signs and had a prominently placed rack for Subaru literature, and that Ricky Smith's advertising expense in several area newspapers and on a number of radio stations exceeded the amount suggested by SNE. The judge stated that Ricky Smith's physical plant had "the appearance of an established dealership and an extremely efficient operation"; its service department seemed more efficient in operation and appearance than the facilities of Midway and

Masabny, which were also viewed by the judge. The judge also found there had been no significant complaints by SNE about Ricky Smith's service to its customers. Since 1976, the judge termed Ricky Smith's level of sales competitive, and in some respects outstanding, in comparison with other Subaru dealers in New England.

The judge summarized and analyzed the defendants' principal arguments with respect to Ricky Smith's relevant market area, rejecting each one. He found that the repeated designation of "normal area of operations" (a term included in the franchise agreement but not defined therein) and "area of immediate influence," viz., the city and towns immediately surrounding the dealership, "ignores the towns where the plaintiff's dealership had actually sold a large number of Subarus, i.e., the market area of the plaintiff." He determined that, although the dealership had maintained a high rate of sales in its immediate area, particularly in Weymouth and Braintree, Ricky Smith had sold more automobiles in northern Plymouth County in 1978 than it had in the towns surrounding its location, and had a better record against compact competition in Plymouth County, especially against Datsun and Toyota, than did other New England Subaru dealers in their respective locales. Further, the record indicates that numerous criteria suggested by the defendants as determinants of Ricky Smith's relevant market area were weighed by the trial judge and incorporated into his subsidiary findings. These factors included consideration of the location of Ricky Smith's customers in recent years; the extent and nature of the market near Ricky Smith's location; the distance between the Ricky Smith and Masabny sites; demographic differences between the two geographic areas; the recent loss of Subaru dealerships in the areas encompassed by both dealerships; and a comparison of New England Subaru dealerships and competitive foreign compact representation.[14]

---

[14] The defendants also proposed that the judge consider, before determining the plaintiff's relevant market area, the eight criteria added to

We are satisfied that the judge did not ignore, or summarily dismiss, the defendants' evidence which was offered to show that the plaintiff was equitably entitled to a different market area from the one chosen. We are also satisfied by the judge's choice of language in his various findings and rulings on the plaintiff['s relevant market area, and by the reasoning process underlying his decision, that he sought to decide the case upon the governing "equitable principles" standard enunciated in the 1970 statute despite his reference to the existence of an independent violation of the 1977 statute.

(b) The judge's determination is also challenged as contrary to language in the *Tober* decision (376 Mass. at 331)[15] which the defendants construe as requiring that relevant market area, under the 1970 version of c. 93B, be determined chiefly by resort to Federal antitrust principles. In their "Proposed Conclusions of Law," however, the defendants urged the judge to rule that "[a]nti-trust concepts of a relevant market area as a geographical area within which competition is to be protected against restraints and monopoly are inapposite to G. L. c. 93B, [§] 4(3) . . . paragraph (l), prior to amendment by St. 1977, c. 717, effective February 5, 1978." Notwithstanding the fact that the trial judge may not have had the benefit of the defendants' present line of argument at trial,[16] we find nothing in the antitrust authorities cited in the *Tober* decision, or now by the defendants, which is inimical to the judge's reasoning. See,

---

c. 93B by St. 1977, c. 717, § 3, with respect to the possible arbitrariness of appointing an additional franchisee. The judge was not obliged, under either the 1970 or the 1977 version of the statute, to consider the factors governing arbitrariness on the question of the geographical boundaries of the existing franchisee's relevant market area. He properly considered these criteria, as will be discussed later, in deciding whether the Masabny appointment was justified.

[15] That language reads as follows: "The 1970 statute did not carry a definition of 'relevant market area', but the concept of a geographic market is a familiar one, explicated in Federal antitrust law [citations omitted]."

[16] The defendants are represented by new counsel on appeal.

e.g., *United States* v. *Philadelphia Natl. Bank,* 374 U.S. 321, 359-361 (1963); *Brown Shoe Co.* v. *United States,* 370 U.S. 294, 336-337 (1962); *United States* v. *Connecticut Natl. Bank,* 418 U.S. 656, 666-671 (1974); *United States* v. *Kimberly-Clark Corp.,* 264 F.Supp. 439, 455-458 (N.D. Cal. 1967); *United States* v. *General Dynamics Corp.,* 341 F.Supp. 534, 556-558 (N.D. Ill. 1972), aff'd, 415 U.S. 486 (1974); 2 Areeda & Turner, Antitrust Law, pars. 524, 534 (1978); Sullivan, Antitrust § 19 (1977).

(c) The defendants next question the trial judge's interpretation and application of the 1977 revision of § 4(3)(*l*) of c. 93B to determine relevant market area. They maintain that the judge could not look to the amended statute for guidance as to the relevant market area and, if he could, that he applied the amendments incorrectly. We think the judge's use of the 1977 statute for "guidance" is authorized by the *Tober* decision. In *Tober,* the court made the following comments on the 1970 and 1977 versions of the statute:

> "The 1970 statute did not carry a definition of 'relevant market area,' but the concept of a geographic market is a familiar one, explicated in Federal antitrust law (e.g., *United States* v. *Philadelphia Nat'l Bank,* 374 U.S. 321, 360-361 [1963]; *United States* v. *Connecticut Nat'l Bank,* 362 F. Supp. 240 [D. Conn. 1973], vacated and remanded, 418 U.S. 656 [1974]; see 2 P. Areeda & D. Turner, Antitrust Law, par 524 [1978]), and the words take on further and clearer meaning when seen in relation to the purposes of the statute in which they are found and the conditions of the automotive industry known or subject to proof [footnote omitted]. The 1977 revision sets out a quite sharp definition which may somewhat sacrifice theoretical correctness to ease of practical application. Again, the 1970 statute stated in brief form the criteria for allowing or denying a new franchise, but it would not require much imagination for the decision maker to read the language as encompassing more or less the factors later enumerated in the amendatory legislation of 1977." 376 Mass. at 331-332.

The defendants concede that this passage permitted the judge to look to the amended statute, as he in fact did, to determine whether the appointment of an additional franchise within an existing franchisee's relevant market area was arbitrary under the cognate provisions of the 1970 statute. It does not follow, however, as the defendants contend, that the *Tober* decision confined the judge to antitrust authorities in determining "relevant market area" or that it barred him from considering the 1977 statute's definition of that term. The *Tober* court gave at least equal emphasis within the quoted language to several sources besides antitrust principles, including "the purposes of the statute" (explicated in *Tober* at 322-323), and "conditions of the automotive industry," as helpful under the 1970 statute, for determining an objecting dealer's relevant market area. At the lengthy trial below, considerable evidence was introduced on these factors.[17] We reject the defendants' attempt to construe the *Tober* decision as merely prohibiting, under the 1970 statute, "the award of a new franchise around the corner." And we do not read that decision to state that a judge could be guided by the 1977 revision of § 4(3)(*l*) for the purpose of determining any arbitrariness in appointing an additional franchisee prior to 1977, but that he should, in the same case, blind himself to the 1977 test for the relevant market area. We hold that it was proper for the trial judge to be guided by the definition in G. L. c. 93B, § 4(3)(*l*), as amended by St. 1977, c. 717, § 3, in determining Ricky Smith's relevant market area under the 1970 statute by "equitable principles."

(d) If the judge was permitted by the *Tober* decision to consult the 1977 statute, it was incumbent upon him to in-

---

[17] The judge received this evidence (indeed almost all the evidence at the trial) de bene, expressly reserving the right to determine relevancy after the conclusion of the trial. All trial counsel acquiesced in this approach. The procedure was sensible in view of the novelty and complexity of the legal issues and the numerous (and sometimes amorphous) circumstances involved in determining an automobile dealership's relevant market area "exclusively by equitable principles."

struct himself correctly on the meaning and application of that statute's definition of relevant market area. *George* v. *Goldman*, 333 Mass. 496, 497 (1956). The record indicates, however, that trial counsel for the parties mistakenly read the 1977 statute's definition of relevant market area as providing for an *election* between the geographical areas comprising two thirds of the plaintiff's retail sales of new automobiles and two thirds of its retail service sales. As a consequence of that error, little or no evidence on the retail service sales prong of the test for relevant market area was introduced.[18] This error in statutory analysis ultimately insinuated its way into the decision, when the judge (apparently concurring in counsels' erroneous interpretation of the statute), based his resolution of the case on the premise that two thirds of sales was the major factor in deciding the plaintiff's relevant market area. In point of law, however, the 1977 act defines relevant market area in precise terms as *"the more narrowly defined and circumscribed geographical area* immediately surrounding its existing dealer location within which it obtained . . . at least two-thirds of (i) its retail sales of new motor vehicles . . . or (ii) its retail service sales" (emphasis supplied).

The error is understandable, since the 1977 statute's wording would perplex even the most percipient logician. Nevertheless, we are left with the virtual absence of evidence on the crucial second component of the 1977 test, and a resultant failure by the judge to consider the full effect of that part of the 1977 definition. Both are matters which may have a direct bearing on the soundness of the decision.

---

[18] Most of the evidence on retail service sales that was introduced came from the defendants since the plaintiff took the position that it was not required to introduce such evidence. In addition to bearing on relevant market area, the plaintiff's service sales record is also relevant to the question of arbitrariness of the additional appointment. The second guideline in the 1977 statute for resolution of that issue specifically requires consideration of "the retail sales and service business transacted by the objecting motor vehicle dealer . . . during the three year period immediately preceding . . . notice [of a new appointment] as compared to the business available to [the dealer]."

We think this aspect of the case falls within "the fundamental rule that a judge sitting without a jury must properly instruct himself upon accurate principles of law to guide him in arriving at a decision in any particular case." [19] *George* v. *Goldman,* 333 Mass. at 497.  Cf. *Kunkel* v. *Alger,* 10 Mass. App. Ct. 76, 84 (1980).  We are left, for lack of foundation in the record, with clear error.  The error is compounded by the judge's improper (but superfluous) ruling that SNE conduct constituted a violation of the 1977 statute.  Consequently, upon return of the case to the Superior Court, we direct the judge to receive evidence on the geographic area comprising the plaintiff's service sales between June, 1975, and May, 1978.  The burden of initial production of this evidence is to be borne by the plaintiff with the defendants to have the later opportunity to rebut it.  Thereafter, the judge is to amplify his subsidiary findings based on the new evidence, and after weighing that evidence together with all the other evidence in the case, he is to rule anew on the plaintiff's relevant market area under the equitable principles formulation of the 1970 statute.

This is not to say, however, that the judge is required to adopt the smaller of the two geographic areas described in the 1977 statute as the plaintiff's relevant market area.  This result would follow if the 1977 statute were deemed to be retroactive.  The general rule, however, is "to construe

---

[19] The fact that defense counsel joined in the error does not in our view bring the case within the general principle stated in *Jones* v. *Wayland,* 374 Mass. 249, 252-253 n.3 (1978).  See *Matter of Roche,* 381 Mass. 624, 629 n.7 (1980); *Altschuler* v. *Boston Rent Bd.,* 386 Mass. 1009, 1010 (1982).  Defense counsel consistently took the position throughout the trial that the 1970 statute governed and that the judge could not consult the 1977 statute for guidance.  This position was repeated in the defendants' requests for rulings of law.  As is evident by now, both the 1970 and 1977 statutes are complex and difficult both in theory and application.  At the time of trial, neither statute's application to hard facts had been discussed by an appellate court.  The proximity of the Masabny appointment to the effective date of the 1977 amendments further complicated the case.  In the circumstances, we think the issue has been properly saved for review.

statutes which deal with substantive rights, rather than remedies or procedure, as operating prospectively only, unless the Legislature has stated the contrary explicitly." *Austin* v. *Boston Univ. Hosp.*, 372 Mass. 654, 657 (1977), and cases cited. See *Spooner* v. *General Acc. Fire & Life Assur. Corp.*, 379 Mass. 377, 379 (1979), and cases cited. The 1977 amendments are, in our opinion, principally substantive in nature. For example, a new definition of relevant market area, the core of the statutory tort, is formulated by the amended statute, and recovery of multiple damages is deleted. See *Cudlassi* v. *MacFarland*, 304 Mass. 612 (1939). Both changes are substantive in nature. We have not discovered any legislative history, and none has been brought to our attention, which indicates that the Legislature intended to make the 1977 amendments retroactive. See *Murphy* v. *Planning Bd. of Norwell*, 5 Mass. App. Ct. 393, 397 (1977). Such an intent is not stated in the statute itself, and the *Tober* decision is silent on the point. We have the added consideration that retroactive application might have the serious result of impairing preexisting rights embodied in the contract between the plaintiff and SNE. *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. 342, 349 (1980). That agreement, for example, is expressly predicated upon the state of the law existing at the time a new dealer is appointed. See *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523, 525 (1974) (expressly holding c. 93B inapplicable to contracts which antedate its enactment). We think the Legislature did not intend the 1977 amendments to apply retroactively.

We also believe that the 1977 amendments were not meant by the Legislature merely to clarify the equitable principles standard in the 1970 statute. It is obvious, after side by side comparison, that the formula definition in St. 1977, c. 717, § 3, creates a bright line test which substantively changes the equitable principles standard in the 1970 statute. Before the 1977 amendments, a judge, confronted with a case like this, would likely consider a multiplicity of factors including conditions in the industry, pertinent anti-

trust principles, the statute's purposes, the circumstances of the parties and the terms of their contract, to evolve, by way of a rule of fairness, the objecting dealer's relevant market area. Now, by virtue of the 1977 amendments, a judge analyzes hard statistical data to draw two geographic areas and, after the areas are platted, he simply chooses the smaller of the two. As was said in the *Tober* decision, 376 Mass. at 331-332: "The 1977 revision sets out a quite sharp definition which may somewhat sacrifice theoretical correctness to ease of practical application." We conclude, under the equitable principles test in the 1970 statute, that the judge should consider the evidence pertaining to both areas described in the 1977 definition, but that he is still free to exercise independent judgment (based on a balancing of all the equities), in selecting the geographic area to which the plaintiff is fairly entitled as his relevant market area.

(e) The defendants also claim that the trial judge erred in finding SNE's appointment of Masabny unjustified and hence arbitrary under the eight discrete criteria set forth in § 4(3)(*l*) of the 1977 version of the statute,[20] by requiring SNE to justify the appointment and by concluding that SNE should have assembled its information in support of the appointment prior to the grant of the Masabny franchise. The judge's principal findings on this issue are set forth in the margin.[21] The judge's finding that the appointment was ar-

---

[20] The parties agree that the *Tober* decision expressly authorized the trial judge to look to and apply these criteria. The judge below stated that he gave consideration "to the clear language of the amended statute" to determine whether justification existed for SNE's appointment of Masabny.

[21] In addition to the dealings between SNE, Ricky Smith and Midway which occurred just prior to Masabny's appointment (see background facts, *supra*), the judge found that it was obvious that SNE "was not going to give the plaintiff the opportunity to say 'yes,' considering the fact that the plaintiff had only five days to accept a speculative offer with little or no information upon which to proceed." He also found with respect to SNE's offer to Midway that SNE "knew . . . that [Midway] was not in a financial position to take advantage of the offer . . . . [SNE] also had to know that placing a new dealership [near Midway] would further compromise the dealership's financial position." Finally, the trial judge found

bitrary is amply supported by the evidence he determined to be the more credible. Upon production of evidence which satisfied the judge that the appointment was arbitrary, the plaintiff had met its burden, and it thereafter became the defendants' obligation to persuade the trial judge that the appointment was proper. We see no error in the allocation of the burden of proof.

The judge could also consider the absence of careful consideration of relevant data at the time the appointment was made as evidence that the Masabny franchise was arbitrarily granted, despite SNE's assembly, after the fact, of information which tended to support its actions. Subsection 3($l$) of § 4 of the 1977 version of the statute plainly contemplates written notice to existing dealers of a manufacturer's or distributor's intent to appoint a new dealer within their relevant market area followed by discussion between the parties of the reasons which warrant the appointment. Obviously, statistical and other data which might have a bearing on a controverted appointment has to be considered at any such discussions.[22] Otherwise, the statute's requirements will likely become hollow formalities and litigation will often ensue. The judge could have properly considered SNE's conduct prior to Masabny's appointment as manifesting indifference to the statute and to the impact that the new dealer would have on existing franchisees. These in turn, in the language of c. 93B, were "pertinent circumstances" in "determining whether [the] proposed appointment was arbitrary."

5. *The plaintiff's contract claim.* The judge also found that the Masabny appointment violated section 20.2 of the

that there was "no credible evidence . . . that . . . [SNE] presented [to Ricky Smith] any statistical criteria to justify the establishment of a new dealership in Hanover."

[22] Section 20.2 of the franchise agreement imposed a similar obligation on SNE by requiring, *prior* to any new dealer appointment "in or near" the market area of an existing dealer, "discussion with affected [d]ealers, [whether] additional sales and service facilities are warranted, based upon objective statistical criteria used by [SNE] to determine market potential in the area."

franchise agreement, see note 22, *supra.* It appears to have been common ground at the trial that in the absence of a definition of the terms "market area" and "normal area of operations" in the contract, the agreement's reference to governance by "applicable law" made c. 93B controlling of the parties' rights thereunder.[23]   The parties have not pressed a contrary argument on appeal, and the judge appears to have decided the case on this premise.[24]   In these circumstances, the plaintiff's rights under the agreement and the statute merge, and we need only review the asserted statutory violation and the plaintiff's entitlement to relief therefor.

6. *The defendant SNE's counterclaims.*  The defendant maintains that the judge ignored uncontradicted evidence that Ricky Smith had committed a breach of sections 4.1, 9.1, 9.2, and 9.3 of the franchise agreement.  These provisions require, in essence, that dealers aggressively promote the sale of Subaru products throughout their market areas. Included in the list of alleged violations were claims that Ricky Smith lacked proper signs identifying the dealership as a Subaru outlet, that it refused to participate in SNE sponsored programs to improve customer services, that it frequently failed to display Subaru automobiles on the showroom floor, that it did not adequately display Subaru promotional materials, and that its market area penetration was lower than that of other dealers; all indicia which the defendant considers reflective of a lax attitude toward sales. The judge found, however, that the "[c]omplaints about the

---

[23] Section 13 of c. 93B expressly provides that the statute's requirements control inconsistent contract provisions.  Although this provision appears to leave the parties free to agree upon requirements more stringent than the statute, we do not think that the use of the word "near" in section 20.2 of this agreement expands the plaintiff's rights beyond the rights conferred in § 4(3)(*l*).

[24] The finding that SNE committed a breach of contract by failing to discuss Masabny's appointment with the plaintiff with reasons based upon objective statistical criteria would not provide the plaintiff with a separate ground of recovery in the absence of proof of damages caused by that breach.

plaintiff's dealership were de minimis when compared to plaintiff's sales record in 1977 and 1978, the awards bestowed on the plaintiff by . . . SNE, and the efficient operation of the plaintiff's combined facility." He ruled that there had been no material breach "of [any] of the articles or provisions of . . . the [d]ealership [a]greement [and] . . . even if the plaintiff had failed in any of its covenants with SNE, the defendant was unable to prove $1.00 of damage." The trial judge's general finding and ultimate ruling quoted above are well-supported by detailed subsidiary findings, many of which have been summarized earlier in this opinion. These subsidiary findings establish Ricky Smith as one of the more aggressive and successful dealers in Subaru's New England distribution chain and they address each of the defendants' claims of breach of contract. We can find no error, much less clear error, in the disposition of SNE's breach of contract claim.

The defendants' second counterclaim alleges that Ricky Smith conspired with other Subaru dealers, in violation of the Federal antitrust laws, to prevent SNE from granting additional competitive motor vehicle franchises in the six-State New England region. At the root of the charge is the fact that the dealership's president participated in the establishment and activities of the New England Subaru Dealers' Council, Inc. (Council). This organization sought to protect the rights of existing Subaru franchisees against perceived unlawful efforts by SNE to expand distribution of Subaru products. The defendants, however, see the Council's aims as more sinister, contending that its members have illegally combined to create de facto horizontal territorial limitations controlled by, and for the benefit of, existing franchisees. See *United States* v. *Sealy, Inc.*, 388 U.S. 350 (1967); *United States* v. *General Motors Corp.*, 384 U.S. 127 (1966); *United States* v. *Topco Associates*, 405 U.S. 596 (1972); *Com-Tel, Inc.* v. *DuKane Corp.*, 669 F.2d 404 (6th Cir. 1982). See also G. L. c. 93, § 2, as in effect prior to St. 1978, c. 459, § 1; *Merchants Legal Stamp Co.* v. *Murphy*, 220 Mass. 281 (1915); *Commonwealth* v. *McHugh*,

326 Mass. 249 (1950). Cf. Glickman, Franchising § 4.02[2] (1981) (horizontal market restraints by franchisors). The judge found that the Council was a prototype of the sort contemplated by G. L. c. 93B, § 10, inserted by St. 1970, c. 814, § 1, which provides that "[e]very franchisee shall have the right of free association with other franchisees for any lawful purpose;"[25] that there was "no proof" that the Council had violated the antitrust laws;[26] and that "there [was] no evidence that [the plaintiff] did anything in restraint of trade as far as SNE is concerned."

The burden of proving an illegal combination or conspiracy in restraint of trade falls on the defendants. Such proof need not be explicit or formal, *Interstate Circuit, Inc.* v. *United States*, 306 U.S. 208, 227 (1939); *American Tobacco Co.* v. *United States*, 328 U.S. 781 (1946); *United States* v. *General Motors Corp., supra* at 142-143, and may be satisfied by circumstantial evidence of business behavior from which the fact finder can infer illegal agreement or activity. See *Theatre Enterprises, Inc.* v. *Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954); *Norfolk Monument Co.* v. *Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704 (1969). It is clear, however, that a mere showing of close relations or frequent meetings between alleged conspirators will not sustain the burden absent evidence that the close ties led to an illegal agreement. See *Oreck Corp.* v. *Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980), cert. denied, 454 U.S. 1083 (1981). Likewise, an association of automobile dealers handling the same line make, formed for

---

[25] The 1977 amendments to c. 93B did not change this provision.

[26] Specifically, the judge found: "Although there is some evidence . . . that this Subaru dealers' association raised a small amount of money for attorneys fees and expenses, for the purpose of subsidizing legitimate legal action against . . . SNE, one of the underlying aims of such an association is to assist one of its members financially when pursuing a legal action in which all may have a common interest. From the evidence, it would appear that there are three suits pending in New England by Subaru dealers against SNE; this case is one of them. There are now 77 Subaru dealers in New England; legal action by three of them does not appear to have inhibited SNE from any of its legitimate activities."

the purposes of processing mutual grievances against their common franchisor, and safeguarding market areas defined and entrusted to the dealers by State statute, does not violate the antitrust laws absent proof of an illegal combination or evidence that illegal means were used to accomplish otherwise lawful ends.

Despite the defendants' attribution of improper motives to the Council's projects, we find nothing in the record which persuades us that the judge's findings are clearly erroneous. In essence, the Council's members pooled resources to gather information about SNE's business practices, to obtain legal counsel for advice on practical ways to correct those difficulties, and to support (by financial assistance and the offer of relevant documentary evidence and oral testimony) litigation brought by members against SNE for claimed violations of State and Federal automobile dealer protection statutes. The Council's activities appear to have been prudently counselled and to have stayed within the confines of antitrust laws.[27]

7. *The plaintiff's remedies.* Although the trial judge reserved the entry of a final judgment embodying damages and other relief pending resolution of the reported question, he declared SNE's agreement with South Shore void, directed South Shore to cease operations within sixty days, and ordered SNE not to terminate its franchise agreement with Ricky Smith pending appeal. In addition, he ruled that Ricky Smith would recover $638 in damages for each new Subaru motor vehicle sold by South Shore in the area where the two competing dealerships' relevant market areas inter-

---

[27] The closest the Council seems to have come to a possible antitrust violation was a motion by which it asked its attorney and a committee to "act very swiftly on the subject of a moratorium on new dealers and a minimum allotment per dealer per month (Report to follow)." The report which in fact followed led merely to a resolve that SNE should take immediate steps "to insure that . . . existing franchises receive an adequate and equitable supply cf Subarus and that decisions to award new franchises take into consideration the insufficient supply of Subarus presently available to the existing dealers." This resolve did not infringe upon the antitrust laws.

sected and overlapped.[28] Most, if not all, of the evidence on damages has already been introduced. The parties have fully briefed the issues pertaining to relief. In view of the considerable amount of time and money already spent on the case, and the parties' estimates of additional time needed to complete the trial, we think it will further the efficient administration of justice if the issues germane to the plaintiff's entitlement to relief are addressed.

(a) Pursuant to directions discussed in part 4(d) of this opinion, evidence is to be received on the geographic area of retail service sales described in subsection (3) (*l*) of § 4 of c. 93B, as appearing in St. 1977, c. 717, § 3. That "area" may prove to be smaller than the "retail sales area" therein described upon which the present determination of the plaintiff's relevant market area rests in major part. Consequently, South Shore's dealership may lie outside the perimeter of the plaintiff's relevant market area. If that proves to be so, and if the judge decides that the area of retail service sales should be Ricky Smith's relevant market area for pur-

---

[28] This would be the area marked "B" on the following sketch taken from a portion of one of the plaintiff's exhibits at trial. It is a conceptualization of the relevant market areas of the two dealerships on the assumption that Masabny's area would be the same size as the plaintiff's. In fact, of course, each dealer's area would probably be irregular in shape.

*June 1, 1975, to May 31, 1978, Sales*

A + B = Ricky Smith's relevant market area

B + C = Masabny's relevant market area

poses of this case (keeping in mind, as previously discussed, that he is not compelled so to find), then a violation of the statute or franchise agreement has not been shown and final judgment should be entered for the defendants.

(b) Assuming, however, that a statutory violation remains, the judge has the power pursuant to G. L. c. 93B, § 13,[29] inserted by St. 1970, c. 814, § 1, to void the SNE-Masabny agreement for a Pembroke dealership.[30] We see nothing in SNE's terse argument (propounded without benefit of helpful citation) which would deny the judge that power.

(c) Ricky Smith would also be entitled to damages. Proof of damages in these cases typically involves a two-step process: first, showing of a causal connection between the defendants' actions and a violation of c. 93B, including proof of some actual injury to the plaintiff's business, and second, once such causal connection is established, quantification of the amount of damage suffered. See *Ford Motor Co.* v.

---

[29] "Any contract or part thereof or practice thereunder in violation of any provision of this chapter shall be deemed against public policy and shall be void and unenforceable." The 1977 amendments did not change this provision.

[30] The 1970 statute did not allow dealers and franchisors to petition for injunctive relief to stay the grant of a new competitive motor vehicle franchise. See *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707, 709 n.3, 712 (1979). Under §§ 4(*l*), 12, and 13 of that statute, enforcement of rights was remitted to arbitration, action by the Attorney General, claims for damages, and requests to have contracts found in violation of the statute voided. The *Reiter* decision, however, addressed the problem of injunctive relief in the context of a request for a preliminary injunction. See also *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.*, 367 Mass. at 471-472. The judge appears to have looked to § 12A, inserted by the 1977 statute, as support for his orders directing South Shore to cease operations within sixty days and prohibiting SNE from terminating the plaintiff's franchise. That statute expressly authorizes the issuance of an injunction to curb violations of c. 93B. The judge's use of § 12A from the 1977 statute suggests that despite the applicability of the 1970 statute there might have been an over-utilization of the principles of the new statute. We think, however, that the trial judge had the power, incidental to the express authority conferred in § 12 of the 1970 statute, to enter the orders in question, and, if it became necessary, to enforce the orders by resort to the court's contempt power.

*Webster's Auto Sales, Inc.*, 361 F. 2d 874, 883-886 (1st Cir. 1966) (damages for antitrust violations). See also *Eastern Fireproofing Co.* v. *United States Gypsum Co.*, 50 F.R.D. 140, 143-144 (D. Mass. 1970).

Proof of the fact of damages required by the first step would be satisfied by "proof of some damage flowing from the [defendant's] unlawful [act]; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969). See *Brunswick Corp.* v. *Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477 (1977); *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U.S. 557 (1981). See also *Derry* v. *Flitner*, 118 Mass. 131, 134 (1875); *John Hetherington & Sons* v. *William Firth Co.*, 210 Mass. 8, 21-22 (1911); *Hall* v. *Paine*, 224 Mass. 62, 64-65, 69 (1916); *Bond Pharmacy, Inc.* v. *Cambridge*, 338 Mass. 488, 493 (1959); *Carlo Bianchi & Co.* v. *Builders' Equip. & Supplies Co.*, 347 Mass. 636, 646 (1964); Restatement (Second) of Torts § 433B(1) comment b (1965). There was competent expert evidence based on Ricky Smith's patterns of past sales, estimates of the dealership's future sales, and Masabny's projected sales, that Masabny's appointment would significantly reduce the plaintiff's sales of new Subaru vehicles in fiscal years 1979 and 1980. For example, it was estimated that the plaintiff would lose sales of eighty-four units in fiscal 1979 or about fifteen percent of its total Subaru sales. This projection was confirmed in part by Masabny's actual sales of Subarus within the plaintiff's relevant market area between its start of operations on November 14, 1978, and commencement of trial on March 8, 1979.[31] There was further testimony that the loss of business would reduce Ricky

---

[31] At the time of trial, there was evidence that Masabny had sold twenty-seven new Subaru vehicles in the "B" area in this four-month period. See note 28, *supra*. The plaintiff's expert had predicated sales of 24 vehicles by South Shore in the "B" area in all of 1979. As a result he suggested that his August, 1978, projection "was indeed a very conservative one because in one-third of a year [South Shore] had already exceeded the number of sales . . . that I had projected for the whole year."

Smith's over-all rate of profit, and that such a reduction would likely have a negative impact upon the dealership's ability to obtain operating capital and floor plan financing, and its ability to comply with other obligations.

The defendants point to evidence that Ricky Smith's actual sales of Subarus between November, 1978, and March, 1979, indicated projected total sales of ninety-seven more units than the total sold in 1978. They contend that the working hypotheses relied upon by the plaintiff's experts are refuted by the sales figures for fiscal 1979, and that Masabny's appointment, in fact, increased Ricky Smith's sales. As a corollary, the defendants suggest that any sales which the plaintiff might lose were due not to competition by Masabny but to the plaintiff's general lack of industriousness.

The arguments fail to take into account two simple propositions, both sustainable on the evidence: that had Masabny not been appointed, the plaintiff probably would have sold more units than it had in fact sold in the relevant four-month period, and that those additional sales would have comprised most or all of the units sold by Masabny. Common sense suggests that the placement of a competing automobile dealership within the market area of an existing dealer should normally have some direct negative economic impact on the existing dealer in terms of lost sales and diminished profits. There was also evidence of Ricky Smith's inventories, "travel rate" (see note 9, *supra*) in 1978 and 1979, and SNE's vehicle allocation policies during the same periods, which tended to corroborate the plaintiff's contention that it had, and would, suffer financial harm as a result of Masabny's appointment. On evidence which is to a large degree contradictory, we cannot say that the judge's finding that injury had in fact occurred is clearly wrong.

We turn then to the quantification factor. The $638 sum per motor vehicle chosen by the trial judge as the measure of damages represented the total of the plaintiff's average net profit on the sale of each new Subaru ($403), and the average

net profit on the sale of the motor vehicle traded by the new vehicle's purchaser ($235). This figure was based upon testimony of the plaintiff's president, the dealership's accountant, and experts from Arthur D. Little, Inc., who had acted in the past as consultants to the automobile industry. The oral testimony of these witnesses was supported by the dealership's income and expense statements and documentary exhibits reflecting its actual sales performance during relevant periods. Somewhat oversimplified, the determination of net profits was reached by calculations which: (i) considered the dealership's new and used car departments and its parts and service department as a single economic entity;[32] (ii) used the dealership's 1978 sales figures as the base year for considering net profits; (iii) allocated 32.5 percent of profit and expense to the Subaru portion of the dealership;[33] (iv) determined the gross sales profit on the sale of new Subaru vehicles and the sale of the used motor vehicle usually received in trade;[34] (v) deducted from that profit variable selling expenses such as salesmen's commissions, vehicle delivery expenses, the cost of policy work on vehicles and legal costs; and (vi) made no further deduction for fixed overhead on the theory that overhead would not have changed if the vehicles sold by Masabny had been sold by the plaintiff.[35]

---

[32] This view of an automobile dealership was acknowledged at trial as one recognized in the industry and in common use by dealerships selling General Motors products.

[33] There was evidence to warrant a conclusion that in the last five years of the dealership's business the plaintiff sold approximately two Pontiacs for each Subaru.

[34] An appropriate adjustment to factor profits and expense attributable to fleet business out of the calculations was made.

[35] There was evidence, however, that fixed overhead was considered by application of General Motors' "break-even" system of accounting. This system calculates the number of vehicle sales necessary to absorb the dealership's actual fixed overhead. That number becomes the dealership's "break-even" point. According to the plaintiff's president, sales above that figure generate a "net amount . . . [which] is pure profit, with some modifications."

The trial judge's assessment of $638 per car for lost net profits constitutes implicit acceptance of the foregoing damages analysis and agreement with Ricky Smith's contention that its fixed expenses would not have increased had the dealership sold additional vehicles.

We first state some general principles on damages. Recovery of profits lost to a plaintiff is, of course, a recognized recovery in business tort cases. The prevailing rule is that damages for such profits must be reduced by any direct expenses that would have been incurred in making the lost sales, but fixed overhead expenses need not be deducted unless they were, or would have been, changed by the receipt of the lost business. See *Roblin Hope Indus., Inc.* v. *J.A. Sullivan Corp. (No. 2)*, 11 Mass. App. Ct. 76, 78-80 (1980) (collecting and discussing the authorities in the context of a labor and materials subcontract on a public project). The reasons behind the rule are analyzed in *Vitex Mfg. Corp.* v. *Caribtex Corp.*, 377 F.2d 795, 797-799 (3d Cir. 1967), and *Buono Sales, Inc.* v. *Chrysler Motors Corp.*, 449 F.2d 715, 719-720 (3d Cir. 1971). See also Dunn, Recovery of Damages for Lost Profits §§ 6.1 through 6.9 (2d ed. 1981). By these standards the plaintiff was entitled to recoup damages in the form of net profits which would put it "in as good a position as if" it had not been wrongfully deprived by the defendants of the opportunity to sell more vehicles in its relevant market area. See *John Hetherington & Sons* v. *William Firth Co.*, 210 Mass. at 21.

The plaintiff was not required to prove its lost profits with mathematical precision. Under our cases, an element of uncertainty is permitted in calculating damages and an award of damages can stand on less than substantial evidence. This is particularly the case in business torts, where the critical focus is on the wrongfulness of the defendant's conduct. See Chief Justice Rugg's opinion in *Randall* v. *Peerless Motor Car Co.*, 212 Mass. 352 (1912). See also *BBF, Inc.* v. *Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 177 (1982), and cases cited. See also, *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass.

603, 607-610 (1961); *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.*, 381 Mass. 1, 9-10 (1980). The plaintiff furnished sufficient information concerning its sales and earnings records to permit accurate computation of damages. That conclusion is not undermined by the fact that its projections were based in large part upon 1978 income and expense records. See and compare *Galvin* v. *Nutting-Pillman Amusement Co.*, 284 Mass. 314, 315 (1933); *Food Specialties, Inc.* v. *John C. Dowd, Inc.*, 339 Mass. 735, 747-748 (1959).

The defendants do not appear to quarrel with these principles, or with the plaintiff's deduction of "variable expenses" from gross profits. They contend, however, that the plaintiff purposely omitted a considerable amount of "semi-fixed" costs which normally would be used to reduce gross profits.[36] They submit that these costs would have had to increase if the plaintiff were to sell eighty-four or more units in 1979. The defendants also maintain that an increase in sales would result in a corresponding increase in "fixed" costs (overhead) which should have been deducted. Citing *Cecil Corley Motor Co.* v. *General Motors Corp.*, 380 F. Supp. 819, 853-858 (M.D. Tenn. 1974), the defendants urge that their damages analysis considered and made proper deductions for fixed and semi-fixed expenses based on the plaintiff's anticipated 1979 sales, and that the lower net profit figure per vehicle reached by their witnesses should have been accepted in place of the plaintiff's estimate.

---

[36] The plaintiff's expense statement (see e.g. exhibit 18D) follows General Motors' method of accounting which establishes three categories of expenses: variable expenses; semi-fixed expenses, and fixed overhead. The variable expenses are those outlined in step (v) of the calculations above. Semi-fixed expenses according to the General Motors system include such items as salaries of owners, supervisors and clerical personnel, other salaries, absentee compensation, payroll taxes, employee benefits and pensions, used car maintenance, company vehicle expense, office supplies, advertising, policy work on parts and service, outside service, travel and telephone. Fixed expenses include such items as rent (mortgage or amortized leasehold), repairs to real estate, taxes, insurance on building and improvements, heat, light and power, equipment rental and depreciation.

The defects in the proof found by the United States District Court judge in the *Cecil Corley* case are summarized on page 858 of that decision.[37] This authority was brought to the judge's attention by the defendants' memorandum on damages. The judge implicitly found that Ricky Smith's proof was not flawed by the difficulties that beset the plaintiff in *Cecil Corley*. We have carefully compared this case with *Cecil Corley* and agree with the judge's implicit determination that that authority is inapposite.

The judge appears to have accepted Ricky Smith's net profits analysis presented by its president (at 387-396 of the record and in exhibits 18D, 40 and 47), as explained and corroborated by the testimony of the company's accountant, and the Arthur D. Little experts. At the same time, he rejected the defendants' evidence of damages, or accorded it little weight. The testimony on both sides was complicated and contradictory. The judge was entitled to consider that some of the assumptions made by SNE's witnesses to reduce damages were discredited in cross-examination, and that the same witnesses grudgingly accepted several of the plaintiff's assumptions as accurate. The judge's implicit finding that the opinion evidence of damages introduced by the plaintiff was the more intelligible and persuasive of the conflicting presentations is a finding well within a trial judge's

---

[37] "In summary, then, this Court finds that the damage theory proffered by plaintiff is wholly inadequate and insufficient to support any award by the jury, for the reasons that it was based: (1) on a profit figure which was not an acceptable net profit; (2) upon assumptions concerning distribution and projected sales which were not supported by the record; (3) upon assumptions and conjectures specifically disclaimed by the witnesses who drew their conclusions therefrom; (4) upon the opinion of an expert who improperly based his assumptions upon that of another witness; (5) upon assumptions which made no attempt to separate lost profits or lost sales relating only to the Pontiac aspect of plaintiff's business as distinguished from its other operations . . . ; (6) upon assumptions which made no attempt to limit damages to the applicable period of potential recovery; and (7) upon speculation, conjecture and guesswork. There being no other evidence on damages, it follows that the proof was insufficient to allow the jury to reasonably infer that plaintiff had suffered damages in any amount."

field of competence. See *Neal* v. *Jefferson*, 212 Mass. 517, 518, 524 (1912); *Nelson Theatre Co.* v. *Nelson*, 216 Mass. 30, 35-36 (1913); *Matsushita Elec. Corp. of America* v. *Sonus Corp.*, 362 Mass. 246, 263-265 (1972); and discussion on the role of experts in computing lost profits in Dunn, Recovery of Lost Profits, *supra* in § 9.2.

We are troubled, however, by one aspect of Ricky Smith's proof. The plaintiff's president seems to have assumed (without directly so stating) that the dealership could sell considerably more Subarus without incurring additional "semi-fixed" expenses.[38] Implicit here is the further assumption that the existing sales and clerical staff would not have to be increased and that other so called "semi-fixed" expenses would remain constant.

On the one hand, added sales of about seven to ten units a month could well be within the dealership's existing capabilities. On the other hand, the defendants argue with some force that the increase in projected sales is sizeable enough to cause a measurable increase in several categories of semi-fixed expenses. We think the point should be clarified below. The plaintiff is to present specific evidence on why these costs would not increase and require deduction along with the variable expenses. The defendants will have the opportunity to establish the contrary. The judge's findings on the issue will, of course, be entitled to a large measure of respect on any further review of the case.

(d) The trial judge implicitly rejected the plaintiff's claim for additional loss profits from the parts and service business generated by new car sales. He may have done so on the basis of testimony by the plaintiff's president which the judge could have construed as relating profits from the parts

---

[38] There was some proof that it would not incur additional fixed expense. We do not think the judge erred in reasoning that this type of expense would not have increased by reason of the extra sales since the plaintiff had the existing facilities to handle them. The judge could have reasoned that the increases which did occur in fixed expenses had been caused by increases in items such as taxes, heat, light and power, and insurance on the buildings and improvements which had been brought about by the steady effects of inflation.

and service shop to the maintenance or reduction of fixed expenses.[39] The plaintiff urges that net profits from parts and service are related to the whole damages picture and constitute measurable losses proximately flowing from SNE's violation of c. 93B, that these profits were not used to offset other expenses, and that the judge misinterpreted or misapplied the evidence on the issue. The defendants contend that profits from parts and service were in fact used to offset expected increases in fixed or semi-fixed costs, that to award them would lead to a double recovery, and, even assuming that the plaintiff would be entitled to some recovery for these items, that their amount was not accurately quantified.

We also cannot decide this question on the present record. The parties' dispute over profits for parts and service was lost in their more intense controversy over net profits from new and used car sales. The issue is logically related to, and may have some bearing on, the problem discussed above. We shall leave the issue for further consideration and amplification consistent with the directions set forth in 7 (c) above.

(e) We disagree with the judge's express ruling that Ricky Smith's damages should be limited to profits lost as a result of Masabny's sales in the so called "B" area, as opposed to those lost through sales made in the plaintiff's entire relevant market area. In so ruling, the judge may have focused on portions of testimony by the plaintiff's experts which

---

[39] Such was the case in *Randy's Studebaker Sales, Inc.* v. *Nissan Motor Corp.*, 533 F.2d 510 (10th Cir. 1976), where a variable net profit analysis somewhat analogous to the one used here (i.e. gross profit less variable selling expenses) was approved on appeal despite no deduction for fixed overhead. The court noted that the "increase in costs created by increased sales activity would be absorbed by the increased revenue from parts and service that also would be generated by increased sales . . . [and further] evidence that . . . fixed overhead costs are covered by profits from parts and service." 533 F.2d at 518. We take this as some indication that possible increases in what are characterized in this case as "semi-fixed" and "fixed expenses" can be offset by anticipated profits from parts and service generated by sales of more new and used vehicles.

used projections of sales in the "B" area as a factor in calculating damages. In our view, this testimony was not intended to confine the plaintiff's damages to the "B" area. The 1970 version of 93B (in § 4[3][*l*]) prohibited the arbitrary appointment of a competing franchise in the relevant market area of an objecting dealer, and (in § 12) permitted a dealer so injured to recover "damages as provided in sections nine and ten of . . . chapter ninety-three A." Neither provision purports to qualify the amount of recoverable damages by reference to the distribution or location of sales among the competing dealers' market areas. We think the statute's purpose of curbing unfair and coercive practices in the automotive industry (see the *Tober* decision, 376 Mass. at 319) can best be effectuated by following the settled principles that unfair competitors should not be allowed to profit by their wrongful conduct and that those injured by such wrongful conduct should recapture full compensation for the loss or injury they have suffered. See *Jet Spray Cooler Inc.* v. *Crampton*, 377 Mass. 159, 169-170 (1979). By so doing, violators of the statute will be deterred from engaging in conduct similar to SNE's in the future. We specifically reject the defendants' argument that this construction of the statute will have a "profound anticompetitive effect." As stated in the *Tober* decision (at 323) the statute will work "sometimes to protect established dealers from new competition . . . but as an incident in pursuit of an ultimately procompetitive goal."

(f) As mentioned above, § 12 of the 1970 version of 93B allowed recovery of damages in accordance with §§ 9 and 10 of G. L. c. 93A, as then in effect.[40] The plaintiff's complaint seeks multiple damages under § 9 of G. L. c. 93A,

---

[40] The 1977 amendment to c. 93B rewrote § 12 to delete the damages link with c. 93A, §§ 9 and 10. New §§ 12 and 12A provided that enforcement of the statute could be requested by an injured party from the Attorney General or sought by way of an action in the Superior Court for damages and equitable relief, including injunctive relief. The reference in § 12 of the 1970 version of the statute to §§ 9 and 10 of c. 93A was occasioned by the fact that § 11 of c. 93A, was not inserted until almost two years after the passage of c. 93B. See St. 1972, c. 614, § 2.

but it has not argued its entitlement to such damages on appeal.[41] In view of the completeness of the record and the parties' briefing of all the apparent damages issues, it appears that that particular claim has now been abandoned.[42]

(g) If possible, final assessment of damages should await South Shore's cessation of operations in Pembroke. The necessary computations at that juncture can be simply made without resort to complicated predictions.[43]

(h) On the issue of damages, we shall expect the judge, when his courtroom work is completed, to make findings of fact and rulings of law in a manner as thorough as the extensive findings and rulings made on the liability issues. His present memorandum indicates considerable industry and scholarship. Our task has been made easier as a result.

---

[41] The complaint also sought recovery pursuant to G. L. c. 93A, §§ 2 and 11. As now recognized by the plaintiff, the decision in *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707 (1979), forecloses any right to a separate recovery under c. 93A except to the extent that § 12 of the 1970 version of c. 93B allowed possible multiplication of damages. The *Reiter* case was decided after this action was commenced.

[42] If this were not the case, we would express the view that the absence of a demand letter from the plaintiff to SNE as described in, and expressly required by, G. L. c. 93A, § 9, prior to the commencement of this action precludes the plaintiff as a matter of law from recovering multiple damages and attorneys' fees. We recognize that the demand letter requirement is jurisdictional under § 9 of G. L. c. 93A, and that failure to comply with the requirement requires dismissal of the entire lawsuit. See *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975); *Entrialgo* v. *Twin City Dodge, Inc.*, 368 Mass. 812, 813 (1975). Although reference to c. 93A, § 9, in § 12 of the 1970 version of c. 93B was somewhat oblique, we do not think the Legislature intended such a dire consequence to flow from the absence of a demand letter in a c. 93B case. The construction we place on the reference in § 12 is a practical one intended to foster the over-all purposes of c. 93B. There is no contention that the exception to the demand letter requirement stated in c. 93A, § 9(3), applies. Nor is there any evidence to support a conclusion that the demand letter requirement had been waived. See *York* v. *Sullivan*, 369 Mass. 157, 163-164 (1975).

[43] There is some indication in the record, although not confirmed yet by counsel, that Masabny may have closed his business.

We have dealt with the reported question and stated our views on the remedies issues. The case is remanded to the Superior Court for further proceedings not inconsistent with this opinion.

*So ordered.*