**DORAN–MAINE, INC., Plaintiff,**

v.

**AMERICAN ENGINEERING & TESTING, INC., Defendant.**

Civ. No. 81–0158–P.

United States District Court, D. Maine.

May 14, 1985.

George S. Isaacson, Alfred C. Frawley, Brann & Isaacson, Lewiston, Me., for plaintiff.

Joseph Lenkowski, Sanford, Me., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GENE CARTER, District Judge.

Plaintiff Doran-Maine, Inc. (Doran) is a manufacturer and distributor of concrete pipe in Maine and throughout New England. Defendant American Engineering & Testing, Inc. (AET) is a materials testing and consulting firm organized and existing under Massachusetts law. Doran was awarded a contract by Lisbon Contractors, Inc., the general contractor for the City of Concord, New Hampshire, to supply concrete pipe to be used in a storm and sewer construction project. AET was engaged by the supervising engineer on the project, Camp Dresser & McKee (CDM), to analyze tests and approve materials to be used on the project, including the concrete pipe supplied by Doran. AET performed tests on Doran's pipe, and subsequently advised CDM that the tested pipe did not meet the absorption standards set forth in the contract specifications for the project. AET further advised CDM that any concrete pipe fabricated on the same machine as the tested pipe would not meet contract specifications. Lisbon Contractors subsequently terminated its contract with Doran for all pipe 24 inches in diameter and smaller.

Under two different theories, Doran alleged that AET was legally responsible for damages it suffered as a result of the contract termination. First, Doran alleged that AET negligently conducted the absorption tests and negligently failed to investigate Doran's claims of inaccuracy, and that AET's negligence caused Lisbon Contractors to terminate its contract with Doran. Second, Doran alleged that AET intentionally interfered with its contractual relations with Lisbon Contractors. The parties agree that Massachusetts law is to be applied. The case was tried to the Court without jury on March 4 and 5, 1985.

The parties have submitted post-trial briefs in support of their respective positions.

### I. *Findings of Fact*

Lisbon Contractors was the general contractor for a sewer construction project which commenced in Concord, New Hampshire in 1980. Lisbon entered into a contract with Doran on June 24, 1980, under which Plaintiff engaged to supply concrete pipe for the project varying in diameter from 12 inches to 36 inches. Doran began fabricating 18 inch Class IV pipe and 36 inch and 30 inch pipe for the project in the summer of 1980.

Camp Dresser & McKee, Inc. (CDM) was engaged by the City of Concord to be the supervising engineer for the project. CDM's responsibilities included the duty to ensure that all project specifications were followed. In accordance with this duty, CDM entered into a contract with AET under which AET undertook to inspect and test reinforced concrete pipe and precast manholes to ensure conformance with CDM's specifications. The agreement between CDM and AET was made on July 18, 1980. Paragraph 3.5 of the contract provided that CDM shall "[c]onsult with Consultant [AET] regarding the qualification of any contractor or subcontractor proposed for this Part of the Project." The agreement provided that AET would be paid sixty-nine cents ($.69) per linear foot of pipe produced for its testing and consulting services. The contract provided that this payment would include all travel costs, tests and other items required by pertinent project specifications. Therefore, the compensation AET was to receive under the contract would not vary with the amount of testing it performed; it was determined by the amount of pipe produced by Doran.

Representatives of AET visited Doran's plant prior to the time that production of the pipe began and periodically after construction began. Doran has two machines for the vertical fabrication of concrete pipe. The smaller machine is capable of fabricating pipe from 6 inches in diameter to 36

inches in diameter. The larger machine is generally used for pipe from 21 inches in diameter to 72 inches in diameter. It was understood by both Doran and AET that Doran intended to use the smaller machine for producing pipe for the Concord project of 24 inches in diameter and smaller, and that the larger machine was to be used to fabricate all larger pipe.

AET was to perform several different tests on the concrete pipe, but only the test for absorption is at issue in this case. The purpose of the absorption test is to determine how much water a piece of concrete pipe will absorb. The concern is that if pipe absorbs too much water, the water will eventually weaken the steel reinforcement embedded in the pipe and abbreviate the useful life of the pipe.

The parties agree that the acceptable method of testing concrete pipe is set forth by the American Society of Testing Materials (ASTM) in Standard C 497. The absorption test is fairly straightforward. It includes two alternative procedures. Method A is the standard test and requires three to six days to complete. Method B is intended as an accelerated test that requires about one and a half days to complete. AET used Method A to test Doran's pipe.

Under Method A, the laboratory technician first dries a sample core from the wall of the pipe in an oven at a temperature of 221 to 239 degrees Fahrenheit for a minimum of forty-eight hours. The sample then must be weighed at intervals of not less than six hours until the increment of weight loss during an interval falls to .1% or lower. Then the dry weight of the sample is recorded. Then the sample is placed in water, which is heated to a boil, and the boil is continued for five hours. The technician then turns off the heat and permits the sample to cool in the water for not less than fourteen hours nor more than twenty-four hours. The technician then removes the sample from the water, places it on the drain rack and allows it to drain for one minute. Excess water is removed from the sample by quickly blotting with an absorbent cloth, and the technician is to weigh the sample immediately following the blotting. To calculate the absorption percentage, the technician subtracts the dry weight of the sample from the wet weight and divides that figure by the dry weight.

The job specifications call for an average absorption percentage not in excess of 5.5%, with no result to be above 6%. AET obtained its first set of absorption test results on August 1, 1980. These results reflected tests performed on samples taken by Doran at AET's request and delivered to AET via parcel post. AET president, William Montgomery, had instructed Richard Davies, vice president of Doran, to take one core sample of 2 inches in diameter and one sample of 4 inches in diameter from each size and class of pipe for each day of production. He gave no instructions as to the location on a specific piece from which the samples should be taken. Tests of samples of 18 inch pipe fabricated on July 17, 21 and 23 were completed by AET technician Henry Walter on August 1, 1980. Several of the absorption percentages were found to exceed the 6% maximum set forth in the specifications, and the average absorption percentage to significantly exceed the 5.5% average contained in the specifications. Montgomery immediately informed CDM and Doran of the test results.

If samples fail to meet specifications in the initial absorption test, the specifications require that two samples from pipe produced on each day be tested. Accordingly, Montgomery again requested Doran to take and to send him two samples of 18 inch pipe for each of the production days of July 17, 21 and 23 for retesting. Again, Montgomery gave no instructions as to the location on a piece of pipe from which the sample should be taken. The average result of the retest, obtained on August 8, 1980, was higher than the average of the initial tests on the 18 inch pipe.

Doran then sent two more samples of 18 inch pipe from each of the production dates, plus 18 inch pipe produced on July 25, 29 and 31, 1980, to AET for another retest. The results of the tests completed

on August 14, 1980, were still higher than those reported on August 8, 1980.

Montgomery prepared a report summarizing test results through August 14, 1980, for a Mr. Charles Loveridge of CDM. The report was dated August 18, 1980. The report was based on work sheets provided by laboratory technician Henry Walter. The report contains one clear inaccuracy. It includes test results obtained August 1, 1980, for pipe produced on July 25 and 29. These results could not possibly have been obtained on August 1, 1980, since AET did not have samples from pipe produced on July 25 or July 29 when the first series of tests was done. Samples from those dates did not become available until after the August 8, 1980, test results were obtained. Montgomery was unable to explain the insertion of these figures. It clearly was not a transcription or typographical error. There is no evidence that the error was in any sense intentional, but it does call into question the care with which AET prepared the report of tests upon which it knew CDM would rely.

In addition to reporting the test results, Montgomery stated:

It is apparent, from the tests as conducted to date, that absorption criteria as specified cannot be obtained on samples representing 18″ diameter production through 7/31/80.

Such results are also indiative [sic], at this time, that all pipe diameters as might be produced on the smaller machine without re-densification would not meet the specified absorption criteria.

Soon after obtaining the results of Montgomery's August 18th report, Doran president Donald Williams requested that AET perform a retest. He said that he had been surprised by the test results because they indicated that absorption percentages generally increased over time. This tendency was contrary to his experience, which was that absorption decreased as pipe grew older. In addition, Williams was "mortified" by Montgomery's prediction that all pipe produced on the smaller machine would not meet absorption specifications, even though

AET had tested only 18 inch pipe produced on the smaller machine. Doran also had intended to produce pipe diameters of 24 inches, 21 inches, 15 inches, and 12 inches on the smaller machine.

Montgomery picked up further sample cores of 18 inch pipe produced on the dates for which pipe had previously been tested, as well as a core from pipe produced on August 8, 1980, from the Doran plant on August 25, 1980. AET completed its retest on August 29, 1980, and reported the results directly to Doran in a letter dated August 29, 1980, which was received by Doran on September 4, 1980. The absorption percentages reported were even higher than those reported for the previous tests completed on August 14, 1980.

Meanwhile, Doran provided sample cores to the independent materials testing firm of Jordan Gorrill Associates for comparison absorption tests. Tests completed by Jordan Gorrill on September 4, 1980, produced markedly lower absorption percentages than had any of the tests performed by AET. Jordan Gorrill tested two samples of 18 inch pipe for each of the production dates from which AET had drawn its samples for its August 29 tests. The average absorption percentage for all pipe tested by Jordan Gorrill was approximately 5.7. In contrast, the average absorption percentage of all pipe tested by AET on August 29, 1980, was approximately 7.1.

On September 5, 1980, Doran vice president Richard Davies wrote to Montgomery to request that a meeting be arranged with Lisbon Construction, CDM, and AET. Davies indicated that he and Montgomery had discussed extensively the test results obtained by AET. He noted that Doran and its predecessor had been manufacturing reinforced concrete pipe at Doran's current location, using similar materials and manufacturing facilities, for many years. He stated that the tests obtained by AET were inconsistent with the results obtained from testing agencies in the past. He attached results of previous tests that had been performed on 18 inch Class IV pipe that had been manufactured by Doran's prede-

cessor in 1974 and 1975. He also included the results of the tests performed by Jordan Gorrill. He made it clear that Lisbon Contractors was refusing to accept Doran pipe for the project because of the absorption test results obtained by AET.

On or about September 12, 1980, a meeting was held at which Williams, Davies, Montgomery and a representative of CDM were present. At the time of that meeting, Williams understood that Lisbon intended to terminate at least a portion of its contract with Doran for the production of concrete pipe for the project. At the meeting, the parties discussed Doran's objections to AET's tests. Williams attempted to persuade CDM to accept the Jordan Gorrill test results in place of AET's test results. CDM refused to do so, and indicated that it would rely upon AET's tests in determining whether Doran's pipe met project specifications. Williams also requested AET to perform another test upon the 18 inch pipe that had already been tested by AET. Montgomery refused to do so, but offered to permit Jordan Gorrill or any other testing agency selected by Doran to monitor AET's tests of pipe to be manufactured by Doran in the future. Williams rejected this offer because his objective was to persuade CDM to accept the pipe that had already been manufactured and tested by AET and because a contract termination by Lisbon, which would deprive Doran of the opportunity to produce other pipe under the contract, was imminent.

Despite Doran's protestations and the discrepancy between AET's test results and those of Jordan Gorrill, AET did not conduct any further testing of the 18 inch Class IV pipe which AET had already tested. Nor is there any evidence that AET retracted its conclusion in its report of August 18, 1980, that none of the pipe manufactured on the smaller machine would

meet project specifications. AET never, in fact, tested pipe of 24 inches in diameter or smaller except for the 18 inch Class IV pipe.

Montgomery was aware that CDM directly relied upon AET's test results in determining whether Doran's pipe would be accepted for the project. Moreover, Montgomery was aware that CDM had the final say as to whether Doran's pipe would be used on the project. Finally, Montgomery was aware that his conclusion with respect to the acceptability of all pipe manufactured on the small machine was likely to be accepted and was likely to result in the cancellation of that portion of Doran's contract with the general contractor.

In a letter dated September 22, 1980, Lisbon Contractors informed Doran that it was terminating its contract with Doran for concrete pipe in sizes of 24 inches and less. It is clear from this letter that the reason Lisbon cancelled was that CDM refused to approve the pipe because of AET's report of its test results. Despite the cancellation, Doran continued to pursue the matter.[1]

The discrepancy in the various test results remains unexplained. Decatur Cousins, who was director of material services for Jordan Gorrill at the time of its tests on Doran's pipe, testified as an expert for Doran. He testified that the absorption test procedure is a simple one with which very little could go wrong. Henry Walter, the laboratory technician for AET who performed the tests on Doran's pipe, testified that he always follows ASTM procedures, but he did not specifically recall performing the tests in question. Nor did Montgomery recall observing any tests performed on Doran's pipe. Thus, there is no direct evidence as to the care with which AET performed the tests.

1. Doran continued to correspond with CDM and, in fact, obtained a second series of independent absorption test results from Keegan Technology and Testing Associates, Inc. of New Jersey on December 16, 1980. These results indicated that the pipe produced on the same dates that had been tested by AET were well within project specifications. Although these test results corroborate Doran's contention that the pipe met project specifications, the evidence does not demonstrate that AET knew of these test results early enough to take them into account when deciding whether to undertake further testing.

With respect to AET's conclusion that the pipe produced by Doran on the small machine other than that tested would not meet project specifications, Cousins testified that he had never "extrapolated" from one pipe size to another. He had never heard of any testing agency doing so, and he believed that AET did not act responsibly by reporting this conclusion to CDM.

AET president Montgomery was also qualified as an expert with respect to the fabrication and testing of concrete pipe. He testified that absorption test results on vertically fabricated pipe can vary from one end of a single piece of pipe to the other because the bottom of the pipe is more dense than the top. Montgomery disagreed with the testimony of Cousins and Williams with respect to the tendency of absorption tests to decrease with the age of the pipe. He did not actually controvert their testimony, but stated that because samples from a single piece of pipe can vary in absorption by as much as one percent one way or the other, it is not possible to discern a consistent trend in absorption percentages as a function of the age of the pipe. If that is so in this case, it is only because he consistently failed to give adequate instruction as to the place of selecting the samples.

In all his dealings with Doran, Montgomery never instructed Doran to take samples from one end of a piece of pipe or another, nor did he ever inquire as to whether particular samples had come from the bottom, middle or top of a section of pipe. Because of this, Montgomery had no way of knowing whether disparities in the test results on the pipe produced by Doran bore any particular relationship to the location from which the samples were taken.

Doran has not proved by a preponderance of the evidence that AET incorrectly *performed*, as a matter of methodology, any of the tests on Doran's pipe. However, AET had information regarding test results which conflicted with its own, which indicated that the trend of its test results conflicted with normal experience, and evidence that its test results were inconsistent with historical tests upon Doran's pipe. Montgomery had not observed the tests performed on Doran's pipe, and could not base any conclusions as to their accuracy upon personal knowledge. He reported two results for tests that never actually took place, which is significant evidence that he did not act with due care in the reporting of the test results. In light of all these facts, the Court finds that AET did not act reasonably or with due care when it persisted in standing by the conclusions contained in its report of August 18, 1980 despite the fact that Doran repeatedly requested that AET retest or reconsider its conclusions.

The Court further finds that the primary cause of Lisbon Contractors' decision to terminate Doran's contract with respect to pipe of 24 inches and smaller was AET's unreasonable refusal to reconsider the conclusions in its August 18 report. That result, AET knew or clearly should have known, would be precipitated by its adamant refusal to confront the substantial question raised as to the accuracy of its test results.

Doran lost gross sales totaling $206,-802.62 as a result of Lisbon's cancellation. The lost profit on the sales, after deducting all variable operating expenses and direct costs that would have been incurred as a result of the sale, is $48,722.70. After the contract was canceled, Doran purchased substitute pipe from a competitor and sold it to the general contractor at the contract price. Doran suffered a loss of $3,119.60 on these transactions. Additionally, Doran incurred expenses for the fees of Jordan Gorrill in the amount of $313.43, fees for Keegan Technology in the amount of $105.00, and carrying charges on unsold 18 inch Class IV inventory in the amount of $3,203.12.

## II. *Opinion and Conclusions of Law*

### A. *Negligence*

█ Doran's position at trial was that AET owed Doran a duty to exercise due care in the performance of its tests and the reporting of the results, that AET breached

its duty, and that this breach was the proximate cause of Lisbon's termination of a portion of its contract with Doran. AET's position is that Doran failed to meet its burden of proving each of these elements of its negligence claim.

AET argues that its duty to exercise due care extended only to CDM, with whom it contracted to provide the testing services. This is a claim for negligence, however, not for breach of contract. Clearly, under the applicable Massachusetts law, liability in tort is not limited to those with whom an actor is in contractual privity. *Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 501, 222 N.E.2d 752 (1967); *see Page v. Frazier*, 388 Mass. 55, 64, 445 N.E.2d 148 (1983). If an actor "should have realized that his conduct might cause harm to another in substantially the manner in which it is brought about, the harm is universally regarded as the legal consequence of the actor's negligence." Restatement (Second) of Torts, Section 435, Comment b (1965). This principle is recognized by the Massachusetts Supreme Judicial Court. *See Rae v. Air-Speed, Inc.*, 386 Mass. 187, 193, 435 N.E.2d 628 (1982). If the Plaintiff's harm was the foreseeable result of Defendant's negligence, Plaintiff has established a cause of action in negligence. *Id.; see also Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752 (1967). In the *Craig* case, the property owner entered a contract with the defendant, a surveyor, to produce plans for a development. The plaintiff was a general contractor who had no contractual relationship with the defendant, but had to rely upon certain aspects of the defendant's work in the performance of its own work. The Court held that the defendant could be held liable to the general contractor for its negligent performance of the work contracted for by the property owner.

In this case, the Court has found that Montgomery was aware that CDM was relying on AET's test results in order to determine whether Doran's pipe met specifications. The Court has also found that Montgomery was aware that his conclusions with respect to the acceptability of all pipe manufactured on the small machine was likely to result in the cancellation of a portion of Doran's contract. Therefore, the injury suffered by Doran was not only foreseeable, but was likely to occur as a result of AET's report of its test results.

It now must be determined whether AET acted negligently in the performance of its tests or in the reporting of its conclusions to CDM. The Court has found that Plaintiff has failed to prove by a preponderance of the evidence that AET negligently performed the tests. The Court has also found, however, that AET acted unreasonably when it stood by its test results despite being presented with substantially lower test results respecting the same pipe from another testing firm, historical test results inconsistent with its own, and the suggestion that the upward trend of its absorption test results over time was contrary to common experience. AET also acted unreasonably when it advised CDM that *all* pipe produced on Doran's smaller machine, including pipe in several sizes that had not been fabricated or tested, would fail to meet project specifications. In both these respects—refusing to reconsider its test results and refusing to retract its prediction as to untested pipe—AET was negligent.

■ AET's negligence was a proximate cause of the termination by Lisbon of a part of its contract with Doran. AET argues that CDM's persistence in relying on AET's conclusion and refusal to adopt alternative tests was an intervening cause of Doran's injury that should insulate AET from liability. Even assuming that CDM's conduct was one proximate cause of Doran's injury, it is clear that AET's negligence was also a proximate cause of the harm. *See Zezuski v. Jenny Manufacturing Co.*, 363 Mass. 324, 328–29, 293 N.E.2d 875 (1973). Once put on notice that its test results and conclusions had been called into question, AET had the authority to retract its conclusions pending further investigation and thereby forestall CDM's decision to reject the pipe. AET's failure to take

such action was a proximate cause of the contract termination.

Doran has established the elements of its negligence claim by a preponderance of the evidence. There being no difference in the damages claimed for alleged intentional interference with contractual relations, it is unnecessary for the Court to consider that claim.

### B. *Damages*

■■■ Recovery of lost profits is a recognized element of damages in business tort cases. *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 440 N.E.2d 29, 48, 14 Mass.App. 396 (1982). Plaintiff is entitled to recover damages in the form of net profits which would put him in as good a position as if the tort had not occurred. *Id.* The Court in *Ricky Smith Pontiac* further stated:

> The prevailing rule is that damages for such profits must be reduced by any direct expenses that would have been incurred in making the lost sales, but fixed overhead expenses need not be deducted unless they were, or would have been, changed by the receipt of the lost business.

*Id.; see also Roblin Hope Industries, Inc. v. J.A. Sullivan Corp.*, 413 N.E.2d 1134, 1136, 11 Mass.App. 76 (1980). Doran is entitled to recover the amount it would have received under the contract, less any direct costs it would have been obliged to incur in performing the contract. *Roblin Hope Industries*, 413 N.E.2d at 1136. The amount should not be reduced, however, by fixed overhead items which would not have been altered by Doran's performance of the subcontract. *Id.*

■■■ The Court has found that Doran's profit on the sale of pipe attributable to the cancellation of its contract with Lisbon was $48,722.70, after deducting all direct costs of the sales and variable operating expenses. Other damages proximately caused by the contract cancellation were $313.43 for Jordan Gorrill's testing fees and $3,203.12 for carrying charges on unsold 18-inch Class IV inventory. Doran has also claimed $3,119.60 for substitute pipe supplied to Lisbon after Lisbon cancelled the contract. Doran produced no evidence that it had any legal obligation to supply the substitute pipe and incur the resulting cost. Rather, Doran voluntarily offered to supply the pipe. Accordingly, the Court will not award Doran damages to compensate for this expense. Doran is entitled to recover damages in the amount of $52,239.25.

Accordingly, it is *ORDERED* and *ADJUDGED* that *JUDGMENT* in favor of Plaintiff Doran-Maine, Inc. shall be entered in the amount of Fifty-Two Thousand, Two Hundred Thirty-Nine Dollars and Twenty-Five Cents ($52,239.25).

So ORDERED.