CONTAINER MANUFACTURING INC., and J. Thomas Jennings, Plaintiffs,

v.

CIBA–GEIGY CORPORATION, Defendant.

Civ. A. No. 93–1345 (AJL).

United States District Court, D. New Jersey.

Nov. 3, 1994.

Earl M. Bennett, Herold and Haines, P.A., Warren, NJ, for plaintiffs.

David W. Field, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendant.

## OPINION

LECHNER, District Judge.

This action was commenced by plaintiffs, Container Manufacturing, Inc. ("CMI") and J. Thomas Jennings ("J.T. Jennings") (collectively, the "Plaintiffs"), against CIBA–GEIGY Corp. ("CIBA") by the filing of a complaint on 24 March 1994. On 30 March 1994 Plaintiffs filed an Amended Complaint (the "Amended Complaint"). Jurisdiction appears to be appropriate pursuant to 28 U.S.C. § 1332.

CIBA filed an answer to the Amended Complaint on 17 May 1994. Thereafter, a status conference took place on 21 June 1994 (the "21 June Status Conference"). At the 21 June Status Conference, the parties discussed the filing of dispositive motions. In particular, it was pointed out that before CIBA filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), counsel to CIBA should write to counsel to Plaintiffs to put counsel on notice as to the areas of the Amended Complaint contended to be deficient. At that point the Plaintiffs would be given an opportunity to amend the Amended Complaint. Thereafter CIBA would be permitted to continue with a Rule 12(b)(6) motion. *See* transcript of the 21 June Status Conference, dated 21 June 1994 at 23 (the "21 June Status Conf.Tr.") As well, the possibility of a Rule 56 motion was addressed and, in particular, the concept of a Rule 56(f) affidavit was discussed with regard to opposition to a Rule 56 motion. *Id.* at 22.

On 12 August 1994 an order was entered denying without prejudice a Rule 12(b)(6) motion for failure to follow Rule 12 N, Appendix N of the Rules Governing the United States District Court for the District of New Jersey (the "Local Rules").

On 8 September 1994 a second status conference was held and at that time the parties discussed the filing of a summary judgment motion pursuant to Rule 12 N of the Local Rules. On 19 September 1994 a summary

judgment motion, dated 19 August 1994, was filed with the Clerk of the Court with a return date of 19 September 1994. The Clerk of the Court responded with the notification that the motion would be set for argument on 24 October 1994. At the request of counsel to the Plaintiffs, the argument date for the motion was then adjourned to, and held on, 31 October 1994 (the "31 October Oral Argument"). *See* transcript of 31 October Oral Argument, dated 31 October 1994 (the "31 October Oral Arg.Tr."). Currently before the court is that motion by CIBA for summary judgment.

The motion by CIBA for summary judgment addresses all claims asserted by J.T. Jennings in the Amended Complaint and the negligence claim of the Plaintiffs contained in count one ("Count One") of the Amended Complaint.[1] For the reasons set forth below, summary judgment is granted as to all claims asserted by J.T. Jennings and as to Count One of the Amended Complaint.

*Facts*[2]

### A. *The Parties*

CMI is a corporation organized under the laws of the state of New Jersey.[3] Amended Complaint, ¶ 1. CMI manufactures plastic containers based on various proprietary technologies and patented designs. *Id.* J.T. Jennings is a New Jersey resident and is the founder, president and fifty percent shareholder of CMI. *Id.*, ¶ 2; Affidavit of J.T.

Jennings, attached to Appendix of Plaintiffs as Exhibit A, ¶ 1.

CIBA is a corporation organized under the laws of the state of New York, with its principal corporate offices located in New York. *Id.*, ¶ 3. CIBA is qualified to do business in New Jersey. *Id.*

### B. *Background*

CMI manufactures plastic containers for various chemical markets. *Id.*, ¶ 5. CMI develops barrier technology and container designs for use primarily in the agricultural, lawn care and pet care industries. *Id.*, ¶ 6. Among the containers manufactured by CMI are those known as Nyalene. *Id.*, ¶ 8. Nyalene is manufactured exclusively by CMI and is also its registered trademark. *Id.*, ¶ 19. In or about November 1987, CMI's Nyalene container met the standards for Underwriter Laboratory, Inc. for storage of flammable and combustible liquids. *Id.*, ¶ 10.

### 1. *The Study*

In December 1988, the United States Environmental Protection Agency (the "EPA") issued a registration standard for a pesticide called Diazinon which included a special storage stability study pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, *et seq.*, on certain formulations of Diazinon in commercial containers (the "Study"). Amended Complaint, ¶ 15.

---

1. In support of its motion CIBA submitted: Brief in Support of Motion for Partial Summary Judgment (the "Moving Brief"); Reply Brief in Support of Motion for Partial Summary Judgment (the "Reply Brief"); Affidavit of David W. Field ("Field"), attorney for CIBA, dated 19 August 1994 (the "Field Aff."), attaching Exhibits A through C.

 In opposition to the motion, the Plaintiffs submitted: Brief in Opposition to Motion for Partial Summary Judgment (the "Opp. Brief" or "Opposition Brief"); Appendix of Plaintiffs, attaching Exhibits A through J.

 Counsel for CIBA informed counsel for Plaintiffs twice by letter of CIBA's intention to file the instant motion. *See* Field Aff., Exhibits B and C. Counsel for Plaintiffs elected not to amend the Amended Complaint, although given an opportunity to do so. *See* 21 June Status Conf.Tr. at 23 (explaining that no further opportunity to amend would be granted after notification, prior to motion, of alleged deficiencies in Amended Com-

plaint and failure of Plaintiffs to exercise the opportunity to amend the Amended Complaint at that point).

2. Most of the facts in this section are taken from the Amended Complaint, affidavits and to the extent necessary from the briefs. According to CIBA: "In moving for summary judgment as a matter of law, CIBA did not submit one fact affidavit but instead stipulated (for the purposes of the [instant] motion only) to all [P]laintiffs' allegations in their Amended Complaint." Reply Brief at 1 n. 1; *see also* Moving Brief at 2 n. 2 ("The facts set forth herein are based upon the allegations made in the ... Amended Complaint which, for the purposes of this [motion] are accepted as uncontroverted....").

3. The Amended Complaint does not allege where CMI has its principal place of business, but instead only that CMI has "its office" in New Jersey. Amended Complaint, ¶ 1.

CIBA conducted the Study and advised the EPA that it would use five commercially available containers identified as glass, tin plate, carbon steel, fluorinated high density polyethylene and Nyalene. *Id.*, ¶ 16.

By letter, dated 11 February 1993 (the "11 February 1993 Letter"), CIBA reported to the EPA that according to the Study, Nyalene containers "exhibited softening and discoloration," were "tacky to touch," and would not, therefore, recommend Nyalene containers for the storage of Diazinon. Amended Complaint, ¶ 20. CIBA did not use Nyalene containers in the Study, but instead incorrectly attributed to Nyalene the poor performance of another product, which it thought was Nyalene. *Id.*, ¶¶ 17–18.

On or about 2 March 1993 the CIBA Regulatory Affairs Manager ("CIBA's Manager") spoke with Robert Jennings ("R. Jennings"), Vice President of Sales and Marketing of CMI, regarding Nyalene. *Id.*, ¶ 26. During this conversation CIBA's Manager never informed R. Jennings about the Study, the 11 February 1993 Letter, that CIBA had advised the EPA that a product it identified as Nyalene performed poorly in the Study or that CIBA was recommending that Nyalene containers not be used. *Id.*

R. Jennings received a telephone call on 2 April 1993, from a CIBA employee who wanted specifications for a Nyalene container that he contended had been shipped to CIBA in 1988. *Id.*, ¶ 27. R. Jennings informed the CIBA employee that CMI had no record of any shipment of Nyalene containers to CIBA in 1988. *Id.* Additionally, R. Jennings explained that it would be impossible to provide specifications due to the large number of potential formulations of different Nyalene containers. *Id.* Three days later, the same CIBA employee telephoned R. Jennings and the two had the same conversation as they had during the previous call. *Id.*, ¶ 27.

Aware that Nyalene was a registered trademark of CMI, that it was exclusively manufactured by CMI and that the containers used in the Study had not been purchased or received from CMI, CIBA did not

inform the EPA of its error until November 1993. *Id.*, ¶ 31.

### 2. *The Prohibition Notice*

On or about 22 August 1993, the EPA issued a "Prohibition on Packaging Diazinon Emulsifiable Concentrate (EC) in Nyalene Containers" to "All Registrants with Pesticide Products ["Registrants"] Containing Diazinon" (the "Prohibition Notice"). *Id.*, ¶ 33. The Prohibition Notice prohibited storage of certain Diazinon products in Nyalene containers and also required Registrants to include on their product labels a warning not to package certain formulations of Diazinon in Nyalene containers. *Id.* The EPA reissued the Prohibition Notice on or about 16 October 1993. *Id.*, ¶ 37. In total, approximately 130 companies, engaged in manufacturing of Diazinon and other chemicals in the agricultural, lawn care and pet care industries received the Prohibition Notice.[4] *Id.*

### 3. *The Rescission Notice*

After a demand by CMI, on or about 10 November 1993, CIBA submitted a letter to the EPA explaining it had not used Nyalene containers in the Study and requesting the EPA rescind the Prohibition Notice. *Id.*, ¶ 44. On or about 18 November 1993, the EPA issued a notice: "Rescission of Prohibition on Packaging Diazinon Emulsifiable Concentrate (EC) Products in Nyalene Containers" (the "Rescission Notice"). *Id.*, ¶ 45. The Rescission Notice advised the 130 companies that had received the Prohibition Notice of CIBA's acknowledged misidentification of the poorly performing plastic containers as Nyalene. *Id.*, ¶ 46. Additionally, the Rescission Notice repealed the prohibition against using Nyalene containers to package Diazinon products. *Id.*

### C. *The Plaintiffs' Claims*

According to the Amended Complaint, "[a]fter C[IBA] knew that the [ ]EPA was considering issuing the Prohibition Notice and notwithstanding ... [being told by R.]

---

4. CMI also alleges CIBA contacted at least one Registrant, on its own, regarding the Study results. *See* Affidavit of R. Jennings (the "R. Jennings Aff."), attached to Appendix of Plaintiffs as Exhibit B, ¶ 10; Opp. Brief at 8.

Jennings that CMI never sampled, sold, supplied or shipped Nyalene containers to C[IBA] in 1988, C[IBA] negligently, intentionally and maliciously failed to advise the [ ]EPA that the ... Study findings reported in the [11 February 1993 Letter] were false...." *Id.,* ¶ 43. According to CMI as a result of the Prohibition Notice and other communications, "CMI suffered immediate lost sales, lost profits and other damages." *Id.,* ¶ 39. Further, "CMI's reputation for superior products, quality control and excellence in barrier technology and unique container design [has been] irreparably damaged as a result of C[IBA]'s actions." *Id.* ¶ 40. Also, the Amended Complaint alleges: "J.[T.] Jennings' reputation in the industry [has been] irreparably damaged as a result of C[IBA]'s actions." *Id.,* ¶ 41.

The Amended Complaint alleges five counts against CIBA: Count One, "Plaintiffs have suffered and will continue to suffer damages in lost sales, in lost profits, by the injury to trade name and reputation and to its registered trademark, and other damages," because of CIBA's negligence; Count Two, intentional, malicious and willful acts; Count Three, defamation; Count Four, tortious interference with contractual relations; and Count Five, tortious interference with prospective economic advantage. *Id.,* ¶¶ 50–54.

In the instant motion, CIBA contends that, as a matter of law, summary judgment is appropriate as to all claims asserted by J.T. Jennings because there are no allegations in the Amended Complaint of any alleged wrongs committed by CIBA directed against him individually. Moving Brief at 4. In addition, CIBA contends that summary judgment is appropriate as to Count One of the Amended Complaint because under New Jersey law negligent publication of falsehoods about a corporation's product is not actionable when the publication involves a matter of legitimate public concern. *Id.* at 6.

*Discussion*

## A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there

is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (holding that disposition of libel case by summary judgment was appropriate where as a matter of law no rational jury could find actual malice by clear and convincing evidence); *see also Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party'") (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict of a material fact is present in the record"); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir. 1991) (summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). "Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with *"specific facts showing that there is a genuine issue for trial."* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied sub nom., Roselle v. Brown,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accom-

plish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted); *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (nonmoving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Aronow Roofing Co. v. Gilbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### B. The Claims of J.T. Jennings

█ A Federal court, in a diversity case, must apply the law of the state in which the court sits to resolve substantive questions of state law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Micromanolis v. Woods School, Inc.,* 989 F.2d 696, 698 (3d Cir.1993); *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 487 (3d Cir.1985). Accordingly, the decisions of the New Jersey Supreme Court will control issues of substantive law in the instant motion.

█ J.T. Jennings asserts by way of his allegations in the Amended Complaint that he has "suffered and will continue to suffer damages in lost sales, in lost profits, by the injury to trade name and reputation and to [CMI's] registered trademark, and other damages."[5] Amended Complaint, ¶¶ 50–54. As argued in the Opposition Brief, J.T. Jennings, in his individual capacity, seeks relief for the "damages he has personally sustained . . . ." Opp. Brief at 36.

---

**5.** Notwithstanding the language of the Amended Complaint, J.T. Jennings contends that only CMI seeks damages for lost sales and profits. J.T. Jennings contends he only seeks damages in his individual capacity "sustained as a result of CIBA's negligence, intentional and willful acts and defamatory statements," and "acknow-

ledg[es] that [he] does not have an independent cause of action for tortious interference with contractual relations . . . [as alleged in count four or for] tortious interference with prospective economic advantage [as alleged in count five] . . . ." Opp. Brief at 36 & n. 2.

In an analogous case, the court in *Pepe v. General Motors Acceptance Corp.*, 254 N.J.Super 662, 604 A.2d 194 (App.Div.1992), *cert. denied,* 130 N.J. 11, 611 A.2d 650 (1993), explained: "The law is clear and uniform: shareholders cannot sue for injuries arising from the diminution in value of their shareholdings resulting from wrongs allegedly done to their corporations." 254 N.J.Super at 666, 604 A.2d 194; *see also Jordon v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1278 (3d Cir.1994) (agreeing with district court's holding that "individual stockholders did not have standing because an action for injury to [a] corporation ... must be pursued in the name of the corporation"); *Insurance Consultants of Am. v. Southeastern Ins. Group, Inc.,* 746 F.Supp. 390, 413 (D.N.J. 1990) (explaining in RICO context: "shareholders of a corporation do not have standing to sue for its derivative claims").

In *Pepe,* plaintiffs, owners of several bankrupt corporations, brought a lender liability action for damages stemming from the demise of their corporations. *Pepe,* 254 N.J.Super at 664, 604 A.2d 194. The complaint in *Pepe* alleged, among other causes of action, "intentional, negligent and reckless" conduct, "malicious interference" with contractual relations, and "willful or negligent destruction of [one of the plaintiff's] name in [the] financial dealings with others...." *Id.* at 664–65, 604 A.2d 194.

The Appellate Division in *Pepe* affirmed the trial court's dismissal of the plaintiffs' complaints because the claims all derived from alleged corporate injuries that could not be asserted by plaintiffs in their individual capacities. *Id.* at 666, 604 A.2d 194. The court explained:

> The causes of action pleaded by the [plaintiffs] all assert losses sustained by them as the result of the destruction of their corporations. As such, *the claims are entirely derivative* of causes of action which, but for their release by the bankruptcy stipulation, would be available to the corporations.

*Id.* (emphasis added).

In the instant case, the causes of action pleaded by J.T. Jennings assert losses allegedly sustained by him as a result of CIBA's actions with respect to CMI. There are no allegations in the Amended Complaint of any actions taken by CIBA that were directed toward J.T. Jennings; rather his claims stem from CIBA's publication of incorrect information about Nyalene. The allegations of lost sales and lost profits are alleged injuries to CMI, as are the injuries to trade name and reputation. Moreover, Nyalene is a registered trademark which belongs to CMI not to J.T. Jennings. Any alleged damage, therefore, that Nyalene may have sustained is likewise a corporate cause of action.[6]

6. Also, the Amended Complaint alleges: "J.[T.] Jennings' reputation in the industry [has been] irreparably damaged as a result of C[IBA]'s actions." *Id.*, ¶ 41. J.T. Jennings argues in conclusory fashion: "CIBA's statements and conduct amounted to defamation against him personally, due to the inseparable connection between J.T. Jennings, CMI and the Nyalene product line he developed." Opp. Brief at 36; R. Jennings Aff., ¶ 2 ("The reputations of CMI and [J.T.] Jennings are interchangeable in the minds of key industry people....").

In support of this argument, J.T. Jennings relies on *Schiavone Const. Co. v. Time, Inc.,* 619 F.Supp. 684 (D.N.J.1985). In *Schiavone* the court held that a genuine issue of material fact existed as to whether a reasonable reader could understand that defamatory statements about a company, baring the name of the plaintiff, referred to the plaintiff himself. *Id.* at 696–97. The court, however, explained that its holding was limited to situations

> where the corporate entity [has few owners] ..., of whom [the plaintiff] is the principal one ... and the person who might well have been responsible for the major decisions of the corporation, *and where the corporate entity bears [the plaintiff's] name.*

*Id.* at 697 (emphasis added).

In the instant case, the alleged defamatory publication was about Nyalene, a registered trademark of CMI. *Schiavone* 's narrow holding is distinguishable from the case at issue. In addition, it appears no other New Jersey case, state or federal, supports the arguments of J.T. Jennings.

Statements from the affidavits of J.T. Jennings and R. Jennings regarding the "interchangeable" or "inseparable" connection between Nyalene, CMI and J.T. Jennings "in the minds of key industry people" do not establish a genuine issue of material fact. *See Liotta v. Borough of Springdale,* 985 F.2d 119, 122 (1993) ("[C]onclusory ... affidavits are inadequate to defeat ... motion for summary judgment."); *Shaw v. Strackhouse,* 920 F.2d 1135, 1144 (3d Cir.1990) (where affidavits are " 'essentially conclusory' " and "lacking in specific facts," court may disregard them)

The claims alleged in the Amended Complaint are "entirely derivative" of those that CMI is permitted to assert. *Id.; see also Jordon,* 20 F.3d at 1278; *Insurance Consultants of Am.,* 746 F.Supp. at 413. Any loss suffered by CMI is recoverable by the corporation only and not by J.T. Jennings individually. *See Pepe,* 254 N.J.Super at 666, 604 A.2d 194; *Jordon,* 20 F.3d at 1278; *Insurance Consultants of Am.,* 746 F.Supp. at 413.

Viewing the evidence submitted in a light most favorable to J.T. Jennings, it is apparent J.T. Jennings has not "come forward with '*specific facts* showing that there is a *genuine issue for trial*'" that could lead a rational jury to find in his favor. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted). Accordingly, as a matter of law, summary judgment is appropriate as to the claims asserted by J.T. Jennings in the Amended Complaint. *See Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12 (holding that disposition of libel case by summary judgment was appropriate); *Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 N.J. 125, 157, 516 A.2d 220 (1986) ("summary judgment practice is particularly well-suited for the determination of libel actions").

C. *Count One of the Amended Complaint* [7]

■ As discussed, Count One of the Amended Complaint seeks recovery for negligence.[8] The inquiry is whether, as a matter of law, CMI is permitted to assert negligence in its action for defamation and disparagement against CIBA.

(citation omitted); *Schoch,* 912 F.2d at 657 (explaining that neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Citizens Bank of Elizabethton, Inc. v. Ken–Penn Amusement, Inc.,* 798 F.Supp. 268, 271 (W.D.Pa.1992) ("[a]ffidavits which are merely conclusory and lacking in specific facts may be properly disregarded by the court"); *Baxter v. AT & T Communications,* 712 F.Supp. 1166, 1174 (D.N.J.1989) ("[t]he court cannot rely on an affirmation of fact not within the affiant's personal knowledge").

7. Because summary judgment has been granted as to all claims of J.T. Jennings, this section is only applicable to what remains of Count One, the allegations of CMI.

The Supreme Court of New Jersey, in a case analogous to the one at issue, held that such a negligence claim could not be maintained. *Dairy Stores,* 104 N.J. at 150, 516 A.2d 220.

*Dairy Stores* involved an action by a corporate plaintiff for defamation and product disparagement. *Id.* at 131, 516 A.2d 220. The case arose out of the defendant's publication of the results of a study it had conducted on plaintiff's product—bottled water. *Id.* at 129–31, 516 A.2d 220. The court assumed, for the purposes of the appeal, that articles detailing the results of the study conducted were disparaging, false and defamatory. *Id.* at 135, 516 A.2d 220. The threshold inquiries were whether the publications were privileged, and therefore, what was the appropriate standard necessary to maintain the action. *Id.*

Similarly, CIBA acknowledges, for the purposes of this motion, the inaccuracy of the published results of the Study. In the instant motion, it must be decided whether CMI may pursue a negligence claim in this action or whether a higher standard of proof is necessitated by a privilege available to CIBA.

The *Dairy Stores* court held that the doctrine of fair comment afforded the defendant a qualified privilege for statements which were a matter of legitimate public concern. *Id.* at 150, 516 A.2d 220. In light of its holding, the court "conclude[d] that the defense of fair comment … should be overcome only by proof of actual malice."[9] *Id.;*

8. Count one of the Amended Complaint alleges:

As the proximate result of the negligence and negligence per se of [CIBA,] the Plaintiffs have suffered and will continue to suffer damages in lost sales, in lost profits, by the injury to trade name and reputation and to its registered trademark, and other damages.

Amended Complaint, ¶ 50.

9. CMI attempts to distinguish *Dairy Stores* on the basis that it, unlike the case at issue, involved a media defendant. *See* Opp. Brief at 29–31. The court in *Dairy Stores,* however, clearly extended its holding to non-media defendants. *Dairy Stores,* 104 N.J. at 153, 516 A.2d 220 ("[W]e conclude that the actual malice standard should apply to non-media as well as to media defendants.").

*see also Turf Lawnmower Repair, Inc., v. Bergen Record Corp.,* 269 N.J.Super 370, 376, 635 A.2d 575 (App.Div.1994) (holding that when a matter of legitimate public concern is at issue: "It follows by the rule of *Dairy Stores,* that the heightened proof standard of actual malice devolves when the owners of the business seek to vindicate their interests in a defamation action."), *cert. granted,* 136 N.J. 30, 641 A.2d 1041 (1994).

To prove actual malice, a plaintiff must establish that an alleged defamatory statement was made with knowledge of the falsity or with reckless disregard as to whether it was true or false. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 929 (3d Cir.), *cert. denied sub nom, Independence Blue Cross v. U.S. Healthcare, Inc.,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Dairy Stores,* 104 N.J. at 149, 516 A.2d 220. This heightened proof standard is in contrast to the lesser showing necessary to maintain a negligence cause of action. *See, e.g. Harrah v. Minnesota Mining & Mfg. Co.,* 809 F.Supp. 313, 318 (D.N.J.1992); *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d 366 (1987).

In reaching its conclusion that drinking water, the subject of the litigation in *Dairy Stores,* was a matter of legitimate public concern and therefore subject to the privilege of fair comment, the court relied on the common law. *Id.* 104 N.J. at 139, 516 A.2d 220.

The court in *Dairy Stores* explained:

Even before the United States Supreme Court accorded constitutional protection to statements about "public officials" and "public figures," the common law recognized that statements about matters of public concern should be protected. Through the principle of fair comment, courts have allowed commentary on public officials, private institutions that spend public funds, creative and scientific works presented to the public, and economic and social welfare events such as strikes and demonstrations. Although constitutional considerations have dominated defamation law in recent years, the common law provides an alternative, and potentially more stable framework for analyzing statements about matters of public interest.

Another reason for turning to the common law is that the constitutional concepts do not comfortably fit the activities or products of a corporation.... [T]he term "public figure" does not readily apply to corporate enterprises, and "public controversy" is poorly suited to describe the commercial activities of such an enterprise. The term "public figure" includes individuals who engage in a public controversy and ill fits a corporation, which ordinarily is interested not in thrusting itself into such controversy, but in selling its products.

*Id.* (citations omitted).

It must be determined whether CIBA enjoys the qualified privilege of fair comment for publication of the inaccurate Study results to the EPA. It is not necessary, however, to distinguish between the defamation and the disparagement causes of action to determine if there is a qualified privilege. *See Dairy Stores,* 104 N.J. at 137, 516 A.2d 220 ("Insofar as defenses to product disparagement are concerned, a qualified privilege should exist wherever it would exist in a defamation action.").

"[T]he doctrine of fair comment extends to virtually all matters of legitimate public interest." *Id.* at 141, 516 A.2d 220. Accordingly, a determination as to the viability of Count One turns on whether the allegedly defamatory publication by CIBA concerns a matter of legitimate public interest. "[T]he critical determination is whether on balance, the public interest in obtaining information outweighs the [plaintiff's] right to protect . . . [its] reputation." *Id.* at 151, 516 A.2d 220.[10]

---

10. Although CIBA, unlike the defendants in *Dairy Stores,* never did actually test the product at issue, this fact does not alter the present inquiry. In this case, CIBA published a false statement about a product just as the court in *Dairy Stores* assumed the defendants had done.

*Dairy Stores,* 104 N.J. at 135, 516 A.2d 220 ("for the purposes of this appeal, we assume that the articles were not only disparaging, but also false and defamatory"); *see also Sisler v. Gannett Co., Inc.,* 104 N.J. 256, 260, 516 A.2d 1083 (1986) (applying actual malice standard for matter of

The Supreme Court of New Jersey, in a case decided on the same day as *Dairy Stores*, is instructive on this point, as it amplified the holding of *Dairy Stores*:

> Commercial vendors have submitted their products for inspection, and presumably invite public attention, with the accompanying risk of occasional disparaging or defamatory commentary. When disparaging or defamatory remarks are made about that product, the diminished considerations of fairness pale in comparison to the public's right to know about products of legitimate public interest. Thus, it is not unfair to burden a corporation with the actual malice standard when statements regarding its commercial activities or products implicating a matter of legitimate public concern are published.

*Sisler*, 104 N.J. at 273, 516 A.2d 1083.

In holding that "as an essential of human life, drinking water is a paradigm of legitimate public concern," *Dairy Stores* noted helpful criteria used to make the determination "whether the activities and products of corporations constitute matters of public interest." 104 N.J. at 144–45, 516 A.2d 220. These criteria included the widespread effects of a product on the public and the amount of government regulation of the business activities and products at issue. *Id.* The court, however, left "to the future a more complete definition of matters of legitimate public concern." *Id.* at 145, 516 A.2d 220.

Both criteria mentioned by *Dairy Stores* favor a finding that CIBA's publication involves a matter of legitimate public concern. The improper storage of chemicals can have sever health ramifications to the general public. Additionally, this industry is subject to intense governmental regulation. In fact, this action stems from such governmental involvement as the publication at issue is CIBA's results of the Study it performed for the EPA.

Perhaps most helpful in the present inquiry, however, is the following explanation by the court in *Dairy Stores*:

> As society in general, and the sale of goods in particular, becomes more complex, the general welfare requires the dissemination of more and more information to the consuming public. Consumers, who are often separated from those in the early stages of a chain of distribution, have a legitimate need to learn about the reputation of the business entities in that chain and the goods that are being distributed. From that need emanates the right to publish information concerning the nature and quality of goods intended for human consumption....

*Id.* at 151, 516 A.2d 220.

While the above-quoted language concerns goods intended for human consumption like drinking water, these principles appear equally compelling with regard to the chemical industry. The storage of chemicals pose potentially sever health and environmental

---

legitimate public concern after finding defendant had "misinterpreted several public deeds and records" prior to writing article accusing plaintiff of receiving undercollateralized loans from a bank where he was former president and founder). Whether, CIBA should enjoy the fair comment defense should turn on whether the subject matter at issue is a matter of legitimate public interest such that discussion ought to be encouraged.

As *Dairy Stores* explains the purpose of the defense of fair comment "is to foster the discussion of matters of legitimate public concern." *Dairy Stores*, 104 N.J. at 150, 516 A.2d 220. Additionally, the court explained that the qualified privilege is "need[ed] for the free flow of information and commentary on matters of legitimate public concern," *Id.*, at 148, 516 A.2d 220.

To differentiate the facts in the instant case from those in *Dairy Stores* would not further the

purpose of the fair comment defense. If, a corporation's activities and product at issue concern a matter of legitimate public concern, then it should be required to make the heightened showing of actual malice. Count One concerns mere negligence.

Whenever discussion on an issue is encouraged there will be inaccurate statements made. This, however, is no reason to stifle debate on matters of importance to society. *Cf. New York Times Co.*, 376 U.S. at 271–72, 84 S.Ct. at 721 (explaining that "erroneous statement[s] [are] inevitable in free debate, and that [they] must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive....'" *New York Times Co.*, 376 U.S. at 271–72, 84 S.Ct. at 721 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)).

risks to society. The public, for the most part, relies on governmental agencies such as the EPA to protect them from these potential harms. To protect the general public, the EPA must, for example, commission studies such as the one at issue to develop proper storage standards for toxic materials. Further, it is imperative that a wide range of information be disseminated regarding subjects such as which plastic containers are safe to store particular chemicals.

In light of these concerns, it is clear that the publication by CIBA at issue does concern a matter of legitimate public concern.[11] CIBA is, therefore, entitled to the qualified privilege of fair comment which requires a showing of actual malice for liability. *See Dairy Stores* 104 N.J. at 150, 516 A.2d 220; *Turf Lawnmower Repair, Inc.*, 269 N.J.Super at 376, 635 A.2d 575.

### D. *Negligence Claims Independent of the Defamation and Disparagement Claims*

 CMI also argues that it should be permitted to maintain negligence claims inde-pendent of the defamation and disparage-ment claims which arose from the publication of the Study to the EPA. *See* Opp. Brief at 16–27.[12]

CMI's support for its contention is wholly lacking, however. CMI cites cases that are not controlling, are outdated and are distin-guishable from the case at issue. For exam-ple, CMI cites *Bulkin v. Eastern Kraft East, Inc.*, 422 F.Supp. 437 (E.D.Pa.1976), which applied New Jersey law. In reliance on *Bulkin*, CMI makes assertions such as "the court found no New Jersey authority that could be construed to require the court to label plaintiff's negligence claim as one for defamation," and that "courts in New Jer-sey" have held consistently that a defamation action will not preclude a suit based on a different tort theory arising from the same facts. Opp. Brief at 18. *Dairy Stores*, which was decided several years after *Bulkin* and other cases on which CMI relies,[13] is on point and was essentially ignored by CMI.

The trial court in *Dairy Stores* held that "a party who claims that its reputation has been

---

**11.** At the 31 October Oral Argument, counsel for CIBA maintained that Plaintiffs should not be permitted to argue that there was no public health issue regarding the Study because they had argued the reverse in a brief submitted to Magistrate Judge Dennis M. Cavanaugh, dated 19 August 1994. *See* 31 October Oral Arg.Tr. at 14–15. Counsel for Plaintiffs responded that such argument had been specifically withdrawn and that there was no fact put in evidence on that point. *Id.* at 15. In the instant motion, whether the Plaintiffs withdrew this argument is *not dispositive on the issue of whether the activity* of CIBA concerned a matter of legitimate public concern.

**12.** According to CMI, its negligence claims *against* CIBA include:
(1) negligently conduct[ing] the Study; (2) negligently fail[ing] to discover it was testing the wrong product; (3) negligently conduct[ing] the polls on which it falsely conclud-ed that carbon steel and "[N]yalene" were not used commercially; (4) negligently fail[ing] to obtain the specifications for the Nyalene con-tainers before conducting the Study; (5) negli-gently fail[ing] to advise Plaintiffs of the exis-tence of the Study, its adverse findings and the EPA's intention to prohibit ... [Nyalene,] even after the foundation of CIBA's assumptions were directly challenged; (6) negligently fail[ing] to obtain the specifications for Nyal-

ene containers it was condemning during the Study; (7) negligently fail[ing] to reconsider its findings about whether it had indeed tested Nyalene after being advised by CMI that no Nyalene was shipped to CIBA; (8) negligently fail[ing] to reconsider the Study results after it became aware that CMI had not shipped Nyal-ene to CIBA, that other studies had contradic-tory results for Nyalene, and that the long term use of Nyalene by CIBA's customer Prentiss and others in the industry was not in accord in any manner with CIBA's test findings; and (9) negligently mail[ing] a false and confusing let-ter to ... [R]egistrants after the Rescission [Notice] was issued on two separate occasions advising that CIBA had demanded that the. EPA rescind the Rescission Notice and implied that CIBA had acquired the containers from a CMI distributor.
Opp. Brief at 24–25.

**13.** Another case relied on by CMI is *Quinones v. United States*, 492 F.2d 1269 (3d Cir.1974). *Quinones*, however, applied Pennsylvania law to de-cide whether multiple tort theories could be as-serted under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 1346(b), for an employer's failure to use due care in maintaining employee records. *Id.* at 1271. This case is not helpful; it does not apply New Jersey law; it is factually dissimilar and it predates *Dairy Stores*.

damaged by a false statement cannot circumvent the strictures of the law of defamation or product disparagement by labeling its action as one for negligence." [14] *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 191 N.J.Super 202, 216–17, 465 A.2d 953 (Law Div.1983) (explaining that a party who runs independent tests of a company's product, but has no relationship with that company, "does have a duty under certain circumstances not to communicate false information about . . . a product it sells," however, "[t]he parameters of that duty and the circumstances under which an action may be maintained for its breach are the subject of the laws of defamation and of product disparagement"), *aff'd*, 104 N.J. 125, 516 A.2d 220 (1986). Accordingly, CMI may not assert any negligence claim independent of its defamation and disparagement causes of action.[15]

■ Viewing the evidence submitted in a light most favorable to CMI, it is apparent that CMI has not "come forward with '*specific facts* showing that there is a *genuine issue for trial*,'" that could lead a rational jury to find in its favor. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted). Accordingly, as a matter of law, summary judgment is appropriate as to the negligence cause of action asserted by CMI · in Count One of the Amended Complaint.[16] *See Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12 (holding that disposition of libel case by summary judgment was appropriate); *Dairy Stores*, 104 N.J. at 157, 516 A.2d 220 (1986) ("[S]ummary judgment practice is particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern.").

---

**14.** This conclusion is consistent with public policy concerns as well. The fair comment defense, and the concomitant actual malice standard, is afforded to encourage speech concerning matters of legitimate public concern. To allow a plaintiff to maintain an action under a less stringent negligence standard for the same publication granted the fair comment defense, because it is crafted as a claim for the underlying negligence that led to the publication, will discourage the very speech the privilege sought to foster.

**15.** CMI relies on *Doran–Maine Inc. v. American Engineering & Testing, Inc.*, 608 F.Supp. 609 (D.Maine 1985). *Doran* is not controlling in the instant case; it is decided under Massachusetts law. *Id.* at 610. Additionally, there is a factual distinction between *Doran* and the instant case.

**16.** CMI contends in its brief that summary judgment is inappropriate until discovery has been completed. Opp. Brief at 35. Rule 56(f) of the Federal Rules of Civil Procedure sets forth the procedure to be followed if a party contends it needs more time for discovery:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for the reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

According to the Third Circuit, this rule "explicitly provides that the party must file an affidavit setting forth why the time is needed[,]" and failure to do so "is usually fatal." *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 510–11 (3d Cir.1994). A Rule 56(f) affidavit must contain " 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.' " *Id.* at 511 (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 140 (1988)).

CMI has not filed an affidavit in compliance with the requirements of Rule 56(f), as articulated by the Circuit. The only support for CMI's contention, that it needs more time for discovery, is found in paragraph nine of the Affidavit of Earl M. Bennett, counsel for Plaintiffs (the "Bennett Aff."), attached to Appendix of Plaintiffs as Exhibit D: "I believe that depositions and other discovery will assist in refuting the propositions advanced in CIBA's present motion for summary judgment, specifically regarding its claim of a public interest . . . and the existence of malice."

Accordingly, CMI has not made the necessary showing that it is incapable of "present[ing] by affidavit facts essential to justify [CMI's] opposition. . . ." Fed.R.Civ.P. 56(f); *see also Pastore*, 24 F.3d at 511 ("Such an amorphous allegation fails to explain what plaintiffs expect[ ] to discover, how it applie[s] to [the instant motion], and why they could not obtain that information elsewhere."). The deficiency of the comments in the affidavit are underscored by the discussion of a Rule 56(f) submission during the 21 June Status Conference. 21 June Status Conf.Tr. at 22.

At the 31 October Oral Argument, counsel for Plaintiffs, in a similarly deficient manner and without offering to submit an appropriate affidavit, again raised the issue of inadequate discovery. "If [P]laintiffs are able to challenge . . . factual issues, it becomes a jury determination. In this case we have almost literally had no discovery." *See* 31 October Oral Arg.Tr. at 5. Again, this is insufficient. *Pastore*, 24 F.3d at 510–11.

*Conclusion*

For the foregoing reasons, the motion by CIBA for summary judgment is granted as to all claims asserted by J.T. Jennings and as to Count One of the Amended Complaint.

